THOMAS F. BENNETT, WILLIAM R. HAMILTON, WILLIAM V. LURIE, LOUIS SZEL, JOSEPH H. WARD, ABRAHAM WOLF, and NOMA LITES, INC., a Delaware corporation,
Appellants in No. 19,

ALBERT GREENBERG,
Appellant in No. 20,

HENRI SADACCA,
Appellant in No. 21,

*vs.*

SEYMOUR PROPP,
Appellee.

*Supreme Court, On Appeal, December 28, 1962.*

*Aaron Finger and Louis J. Finger,* of Richards, Layton and Finger, Wilmington, and *Milton Kunen,* of Kaye, Scholer, Fierman, Hays & Handler, New York City, for appellants in No. 19.

*Arthur G. Logan,* of Logan, Marvel, Duffy & Boggs, of Wilmington, and *Milton Pollack* and *Samuel N. Greenspoon,* New York City, for appellant in No. 20.

*H. Albert Young* and *Bruce M. Stargatt,* of Morford, Young & Conaway, Wilmington, for appellant in No. 21.

*William E. Taylor, Jr.,* Wilmington, and *Abraham L. Pomerantz,* of Pomerantz, Levy & Haudek, New York City, for appellee.

SOUTHERLAND, C. J., and WOLCOTT and TERRY, JJ., sitting.

SOUTHERLAND, Chief Justice: Certain of the directors of Noma Lites, Inc., appeal from an order of the Vice Chancellor directing them to account to Noma for damages claimed to have been suffered by it by reason of the purchase by Noma of a large block of its common stock.

The facts are these:

Noma, a Delaware corporation, is engaged in the business of selling decorative lighting equipment. It was founded in 1953 as a result of a "spin-off" from Noma Electric Corporation. Mr. Henri Sadacca, who had been the principal executive of Noma Electric, became the principal executive of Noma. At the times here important he was Chairman of the Board, but he seems to have been regarded in the industrial and financial world as Noma's executive head. He and his fellow directors owned or controlled about 193,000 of the 944,284 issued shares.

In early 1958 Noma's directors became interested in acquiring a substantial stock interest in American Screw Company, a Rhode Island Corporation, engaged in the manufacture of certain fastening devices. About 20% of the voting shares were bought. Additional purchases were made during the following month, and by the end of November a 51% interest had been acquired.

In October American Screw called a stockholders' meeting to vote on a proposal to sell its assets to Textron, Inc., a large corporation of diversified interests. Mr. Royal Little is Textron's principal executive. Upon learning of the plan Noma's directors met and determined to oppose it vigorously. At the stockholders' meeting November 3 it was defeated. Apparently the episode induced in Sadacca a feeling of apprehension with respect to Little's intentions.

Shortly thereafter, on November 21 Little wrote Sadacca a letter, marked "personal and confidential", advising Sadacca that he (Little) intended to ask his board to make an offer to purchase 472,143 shares of Noma. (This was one share more than 50% of Noma's outstanding stock.) The offer was not to all stockholders pro rata, but on a "first-come first-served" basis.

Sadacca received the letter Saturday morning, November 22. He showed it to Mr. Joseph M. Ward, the President and a director, and to Cyr, the secretary. He expressed great resentment. He said that Little, defeated in his effort to acquire American Screw, now was trying to "come in the back door" by acquiring Noma.

Sadacca did not submit the letter to the board. On Monday, November 24, and again on Wednesday, November 26, he proceeded to buy on the market a total of 199,100 shares of Noma stock—over one-fourth of the publicly-held shares. This action was taken without any authority from the board, and without the knowledge of any other director or officer except Ward, the president. Ward on Wednesday, the 26th, asked Sadacca about the activity in the stock and Sadacca said that "we" had been buying it. Thus Ward knew on Wednesday, in a general way, what Sadacca was doing. That the whole matter was highly irregular is clear. One of the brokers who executed Sadacca's orders admitted that this was the first instance in his forty years in the brokerage business that a large quantity of stock had been purchased for a corporation without corporate authorization. Naturally, the market price went up—from 9 to 13.

Whether Sadacca intended to make the purchases on his own behalf or on behalf of the corporation is disputed. The purchases, or at least some of them were not originally made in Noma's name. We infer from the Vice Chancellor's opinion that he thought the in-

tention was to buy for the corporation, and we think this is the correct inference from the evidence.

On Tuesday, November 25 (following the Monday stock purchases), Sadacca met with Little and offered to sell to Little either American Screw or Noma shares. (Because of Sadacca's inadequate English, it is uncertain which he was talking about.) Sadacca's testimony was that he told Little he had bought over 100,000 shares of Noma the day before; and he added: "They know that we had the control.* * * We beat the hell out of him." Again, he may have been talking about control of Noma, or control of American Screw.

After completion of his purchases on November 26, Sadacca went to several banks to raise the money to finance them—about $2,322,000. Noma's current assets were quite insufficient for the purpose. In fact they were actually less than its current liabilities. Its business was seasonal and the preceding months had shown a loss in net income.

On Friday, the 28th, Sadacca visited several New York banks, seeking a loan to finance the purchases. All refused. Sadacca then called a special meeting of Noma's board for the following Saturday morning. All directors except one attended. (He subsequently signed a waiver approving the action taken.)

Sadacca laid the situation before the board and asked for a resolution approving what he had done. Most of the directors were entirely unaware of what had happened. A long discussion followed. One infers from the accounts of the various directors who testified that the principal topic of discussion, in the light of Noma's financial condition, was the means to raise the money to meet the next Monday's deadline (four business days after the preceding Monday's purchases). Questions touching the legality of the chairman's acts and the legal responsibility of the corporation were not raised. During the meeting arrangements, completed on Sunday, were made with a factor, A. J. Armstrong Co., for a loan against accounts receivable for nearly $3,000,000, with interest at one per cent a month.

The following resolution was adopted, Sadacca and one other director, David L. Kaltman, not voting:

"RESOLVED, That the action taken by the Chairman of the Board in purchasing in behalf of the Corporation a total of 199,100 shares of the Common Stock of the Corporation at a total cost to the Corporation of $2,322,896.41, be and the same hereby is approved and ratified in all respects."

The loan was effected and Noma paid for the stock.

The present suit followed.

The complaint charges waste of corporate assets in two respects: payment of excessive compensation to friends and relatives of Sadacca; expenditure of corporate funds to buy stock to preserve control; payment of excessive prices for the stock, and payment of excessive interest on the loan to finance the purchase. The first charge was never pressed.

In substance, the Vice Chancellor held:

(1) That Sadacca had no authority, express or apparent, to bind his corporation to the purchases that he made.

(2) That the purchases were made to preserve management control.

(3) That they could not be justified on the ground that Little's attempts to acquire first American Screw and then Noma stock constituted an immediate threat to Noma.

(4) That the directors faced with a possibility of default on the following Monday, summarily ratified Sadacca's hasty act, without giving any consideration to other possible means of coping with the situation.

Accordingly he directed an accounting for damages from all of the directors except Kaltman, who did not vote upon the November 29 resolution.

Three appeals are before us: one by Sadacca, one by Albert Greenberg, a director, and one by all the other directors.

Reference to "directors" hereafter is to the directors other than Sadacca and Ward. The reason for this division will appear hereafter.

As we read the briefs counsel for defendants do not assail findings (1) and (2) of the Vice Chancellor. They advance two contentions:

First, they urge that Sadacca's purchases, and the directors' ratification, were justified because Little's actions posed a serious threat to Noma's welfare. They rely on the Vice Chancellor's prior decision in *Kors v. Carey*, 39 *Del.Ch.* 47, 158 *A.2d* 136.

Second, they urge that the imminence of the Monday deadline confronted the directors with an emergency of a serious nature. If Noma failed to pay for the shares bought by Sadacca, the brokers would sell the shares to protect themselves and would seek to hold Noma responsible for any loss. Noma's credit would be adversely affected. The directors' decision to ratify was thus one made in the exercise of business judgment, and they may not be held liable. *Blish v. Thompson Automatic Arms Corp.*, 30 *Del.Ch.* 538, 64 *A.2d* 581; *Davis v. Louisville Gas and Electric Co.*, 16 *Del.Ch.* 157, 142 *A.* 654.

■ 1. The Vice Chancellor rejected the directors' first contention, and we think that he was right. Sadacca's purchases were made to preserve the control of the corporation in himself and his fellow directors. His statement to his board in the November 29 meeting practically admitted as much; at all events we have no doubt about it. The use of corporate funds for such a purpose is improper. The general principle has been recognized in Delaware. *Macht v. Merchants Mortgage and Credit Co.*, 22 *Del.Ch.* 70, 194 *A.* 23 (use of corporate funds by dominating director to assist him in procuring his control is illegal); *Yasik v. Wachtel*, 25 *Del.Ch.* 247, 256, 17 *A.2d* 309 (general rule approved). See also *Andersen v. Albert, etc. Mfg. Co.*, 325 *Mass.* 343, 90 *N.E.2d* 541 (use of corporate funds by directors to purchase stock for themselves and for the corporation to obtain control is a breach of fiduciary duty).

An exception to the rule was recognized in Delaware in *Kors v. Carey*, 39 *Del.Ch.* 47, 158 *A.2d* 136. That case involved a purchase of about 16% of the issued shares of its own stock by Lehn & Fink, a manufacturer of drugs and cosmetics from United Whelan Corporation, for the purpose of defeating United's attempt to gain control

of Lehn & Fink, was justified. The evidence in that case showed clearly that United wished to control Lehn & Fink in order to force upon it a business policy that Lehn & Fink's directors believed, on manifestly reasonable grounds, would be quite injurious to their corporation. Their considerations of the problem dated back nearly a year before the purchase.

This decision does not help the directors here. Little's attempt to buy American Screw had already been defeated. His letter of November 21 to Sadacca posed no immediate threat. In our opinion, contrary to plaintiff's, it was a thinly-veiled attempt to induce Sadacca and his fellow stockholder-directors to sell out to Little. There was no immediate indication that Little would start to buy large amounts of stock in the market. The argument that Little was dangerous because of his record as a "liquidator" was answered by the Vice Chancellor. He found from the evidence that the attacks at the trial on Little were largely afterthoughts.

In any event, the directors made no finding of immediate threat. They were not even consulted.

The case of *Martin v. American Potash & Chemical Corp.*, 33 *Del.Ch.* 234, 92 *A.*2d 295, 35 *A.L.R.2d* 1140, also relied on, involved a reduction of capital. The statute applicable to that case permits the purchase of shares for retirement at private sale. The fact that the purchase was prompted by existing dissension in the board was held not to render it illegal.

The decision is obviously distinguishable on two grounds. First, a reduction of capital surrounded by the statutory safeguard of a notice and a stockholders meeting is quite different from the purchases of common stock made here under the general power conferred by § 160 of the corporation law, 8 *Del.C.* § 160. Second, the elimination of a dissentient faction for genuine business reasons, as in the *Kors* case, is quite a different thing from the purchase of stock for control purposes before any real threat to corporate policy has occurred. The *Potash* case is also of no help to defendants.

It is our opinion that Sadacca's sudden decision to buy 200,000 shares of stock in two or three days was not only an unauthorized act on behalf of Noma, but was unjustified on the facts.

■ We must bear in mind the inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy when a threat to control is involved. The directors are of necessity confronted with a conflict of interest, and an objective decision is difficult. See the comments on the instant case in 62 *Col.L.Rev.* 1096, 1100. Hence, in our opinion, the burden should be on the directors to justify such a purchase as one primarily in the corporate interest. See 70 *Yale L.J.* 308, 317. They sustained that burden in the *Kors* case; they have not done so here.

It is our opinion that so far as the directors' defense depends on the rule of the *Kors* case it must fail.

■ 2. The alternative defense is that of a business decision made in a sudden emergency to protect the corporation from serious injury. The defendant's contention may be thus summarized:

At the meeting of November 29 most of the directors learned for the first time what Sadacca had done. They were suddenly and unexpectedly confronted with a situation which threatened financial embarrassment and possible disaster to Noma. The commitment must be met. The day was Saturday the larger part must be met by Monday. Under the circumstances they did the best they could; they raised the money, ratified the transaction, and preserved Noma's credit. In their business judgment it was the only thing to do. In the exercise of that judgment the law protects them from liability. So runs the argument.

This defense was clearly stated by Mr. Thomas F. Bennett, one of the so-called independent directors, who was a former Vice President of the Chemical Bank and New York Trust Company. After testifying concerning Sadacca's report about the letter from Little he continues:

"A. Naturally then realizing, when I found out, that the deadline for delivery was on Monday morning, I was more concerned than I had been before, and realizing I was a director, I was put on a spot which was a very unenviable one.

"We explored every means available to us as to how we could raise money and meet that deadline. I felt if we didn't

meet that by Monday morning, the house of cards would fall, and in my banking experience and my Wall Street experience I knew that on Monday morning the brokers would immediately have dumped that stock for any price they could get for it, taken a judgment against the company, slapped a lien against the bank accounts. We were indebted to the Marine Midland, and I felt that the Marine Midland might call our loans. We had substantial amounts owed to General Electric and Westinghouse, and they certainly would put pressure on when a situation like that developed. So I felt in the interest of the stockholders we had to do something to take care of that obligation which had been created unbeknownst to me.

"Q. Mr. Bennett, have you given your reasons as to why you ratified Mr. Sadacca's purchases?

"A. Why I ratified them? No, I haven't given the reasons, I don't think, fully. After weighing them and realizing the situation we faced on Monday morning, I said I outlined that I thought that the house of cards would fall, that the stockholders certainly would be hurt, and as a director I thought it was my duty to do everything in my power to try to help raise the money and meet the obligation which we had to meet Monday morning.

"Q. Did you weigh the consequences of ratifying as against the consequences of rejecting?

"A. I did."

The testimony of directors Greenberg, Hamilton, and Szel is to the same effect, although the last-named also emphasized the need to meet the Little threat. Plaintiff makes some point of the fact that these directors did not specifically say that the danger from the brokers' actions was discussed; but we think that it must have been obvious to all.

This defense impresses us as having merit. It will not do, as plaintiff argues, to say that the brokers had no case. It is reasonable to believe that they would certainly have sought to hold Noma; and who can say what the consequences might have been? Sadacca had confronted his directors with a *fait accompli,* as the Vice Chancellor

put it. But the Vice Chancellor in effect held that the directors' emergency did not relieve them from the duty of exploring other methods of coping with the situation. In our view, the pressure of time excused them from such efforts. They may not have made the best decision; we cannot say. Perhaps a telephone call to the brokers might have given time for negotiation; on the other hand it might well have precipitated serious litigation Monday morning. Upon the whole, we think that the directors cannot be blamed for deciding to take up the stock in the interest of protecting the corporation from dangerous litigation.

It is true that the minutes and resolution are, in our opinion, ineptly drawn. In reciting reasons for directorate action they refer only to the need of repelling Little's supposed threat. But minutes, as plaintiff's counsel candidly admits, may be supplemented by oral testimony, and the testimony here supplies the justification for the board's action.

But this conclusion does not, as defendants' counsel appear to assume, dispose of the case as to Sadacca or as to Ward. Their positions are different. They will be separately considered.

First, as to Sadacca. We are of opinion that the resolution ratifying Sadacca's acts was not effective to legalize the purchases. The directors were without power to ratify them, for they were illegal when made. The resolution was effective only to authorize the officers to take up the stock and pay for it. As against the corporation, the board could not ratify Sadacca's unlawful act nor exonerate him from any liability that he may have incurred to the corporation by reason of saddling it with the responsibility to pay for the shares. The legal consequences of this distinction between Sadacca's position in the lawsuit and that of his fellow directors are not developed on the briefs. As we recall the argument, questions were addressed to counsel whether such a distinction existed. If we recall correctly, the answer from counsel for one of the directors was in the affirmative; the answer from counsel for the other directors was non-committal; and the answers from Sadacca's counsel and plaintiff's counsel were (for different reasons) in the negative.

But notwithstanding the failure of counsel to develop it we think that it is obvious. If the directors had, prior to Sadacca's purchases, undertaken to authorize him to make them to ensure the continuance of their control, the resolution would have been wholly ineffective to protect him. Indeed, it has been suggested that even stockholders' ratification might be ineffective. 70 *Yale L.J.* 320; *Campbell v. Loew's, Inc.,* 36 *Del.Ch.* 533, 134 *A.2d* 565. We express no opinion upon that, but we do hold that the resolution was ineffective to legalize what Sadacca did. It follows that the resolution has legal validity only to the extent of authorizing the officers to take up the stock to save the corporation from financial difficulty. Under § 160 they had legal power to do it, and because of the special circumstances we think that the power was not abused. But Sadacca remains liable for his acts.

■ Second, as to Ward. We have already exonerated the directors who learned about the matter for the first time at the meeting, on the ground that they were confronted with the necessity for a sudden decision in an emergency. We have thus made an exception to the general rule that directors who use corporate funds to preserve control commit a wrong. This exception depends upon the two circumstances proved in this case: prior ignorance and immediate emergency. If either of these circumstances had been absent the directors approving and ratifying Sadacca's purchases would clearly have been jointly liable with him to the corporation.

Ward's prior knowledge of these purchases is sufficient to deprive him of the benefit of the exception. He was the president of the corporation. He had enough time before the following Monday to consult with his fellow officers and directors, to consult counsel, and to take steps to make some arrangements with the brokers beneficial to Noma. As president, he could surely have called a directors' meeting. He did nothing. Apparently he did not even inquire of Sadacca how many shares Sadacca had bought, how much had been paid for them, or how Sadacca expected to finance the purchases. One gets the impression from the record that he was entirely subservient to Sadacca.

We think that his knowledge of the purchases, his silence and failure to act, coupled with his vote on the resolution, constituted a

course of conduct amounting to approval of and participation in Sadacca's wrongful acts. This is not to hold Ward guilty of negligence as counsel seem to think the Vice Chancellor did. It is to hold that his actions made him jointly and severally liable with Sadacca for the tort of using corporate funds to maintain control.

We are of opinion that, with the exception of Ward, the directors who voted for the resolution must be exonerated of wrongdoing; and that Sadacca and Ward must be held liable for any damages proximately suffered by Noma as a result of Sadacca's unlawful acts.

The judgment below is accordingly affirmed as to Sadacca and Ward and reversed as to the other directors; and the cause is remanded for accounting proceedings against Sadacca and Ward.