629 F.2d 287
 JOHNSON, Gilbert P. and Johnson, Hervey M.
v.
Samuel J. TRUEBLOOD, Arnold E. Trueblood, Harvey I. Salwen,
and Penn Eastern Development Company
Gilbert Johnson and Hervey Johnson, Individually and
derivatively on behalf of Penn Eastern Development
Corporation, Appellants.
 No. 79-1892.
 United States Court of Appeals,
Third Circuit.
 Argued March 18, 1980.
Decided July 31, 1980.
As Amended Aug. 19, 1980.
 
 Myron M. Cherry (argued), Cherry, Flynn & Kanter, Chicago, Ill., Drinker, Biddle & Reath, Philadelphia, Pa., for appellants.
 Steven E. Angstreich (argued), Martin M. Krimsky, Krimsky, Luterman, Stein & Levy, Philadelphia, Pa., for appellees, Samuel & Arnold Trueblood.
 Richard M. Squire (argued), Roslyn G. Pollack, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for appellee, Harvey I. Salwen.
 Before SEITZ, Chief Judge, and ROSENN and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 The plaintiffs, Gilbert and Hervey Johnson, appeal from a judgment for the defendants, majority shareholders and directors of Penn Eastern Development Co., in this diversity suit charging the defendants with fraud and breach of fiduciary duty under Delaware law.
 
 I.
 
 2
 The present controversy centers on the conduct of the affairs of Penn Eastern, incorporated in June 1968 as a real estate development company. The plaintiffs, Gilbert and Hervey Johnson, owned a 47 percent interest in Penn Eastern. The defendants, Samuel and Arnold Trueblood and Harry Salwen, collectively owned the controlling 53 percent interest. At its inception, a major asset of Penn Eastern was land known as the "Red Caboose" property owned by the Truebloods and a man named Louis Siana. This property was originally purchased for $48,000 and sold by the Truebloods and Siana to Penn Eastern in exchange for $75,000 of its capital stock.[1]
 
 
 3
 Penn Eastern was the sole general partner in a limited partnership called The Village Center, Ltd. This partnership was formed for the development of a shopping center which was to be Penn Eastern's sole major asset. Penn Eastern, however, began to develop severe cash flow problems in 1972. In November 1973, the Truebloods proposed acceptance of a loan to the corporation by a Frank Pierce. The plaintiffs opposed this loan, urging that it was not beneficial and that they had the financial resources to loan Penn Eastern the requisite capital. By its terms, however, the plaintiffs' loan would have resulted in a shift in control of Penn Eastern from the Truebloods to the plaintiffs. By a 4-2 vote, the Penn Eastern Board of Directors,[2] rejected the plaintiffs' proposal and accepted the Pierce loan.
 
 
 4
 The Pierce loan failed to solve Penn Eastern's cash flow problems, and the corporation ran into difficulties meeting the loan repayments. The defendants proposed an amendment to the Pierce loan agreement by which the Red Caboose property would be sold at absolute auction in May 1975. The plaintiffs opposed this action because the real estate market was depressed, and they feared Penn Eastern would sell one of its major assets at less than its full market value. The plaintiffs offered to tender the payments due on the Pierce loan to avoid auctioning off the Red Caboose property. This proposal was rejected and the property sold.
 
 
 5
 Penn Eastern's financial condition continued to deteriorate when in November 1975, to shore up Penn Eastern's treasury, the defendants proposed a sale of twenty-one shares of Penn Eastern stock to Arnold Trueblood at the price of $750 per share. The plaintiffs counterproposed that Penn Eastern sell twenty shares of the stock to them at $1,000 per share. This would have resulted in a shift in corporate control to the plaintiffs, and it too was rejected and the sale to Arnold Trueblood approved. Despite the new infusion of capital arising out of the sale of stock, Penn Eastern's financial condition continued to deteriorate.
 
 
 6
 The plaintiffs filed the present shareholders' derivative action in the district court alleging violation of the federal securities laws and Delaware corporate law.[3] The complaint sought rescission of the sale of stock to Arnold Trueblood and damages on behalf of Penn Eastern.
 
 
 7
 During the pretrial and discovery phases of the trial, Penn Eastern, as the general partner of The Village Center, Ltd., filed for reorganization under Chapter XII of the Bankruptcy Act. Penn Eastern attempted to reorganize The Village Center, Ltd. by soliciting additional investments from the limited partners. When this proved unsuccessful, the plaintiffs were notified that no plan would be presented to the Bankruptcy Court, and that court subsequently dismissed the reorganization petition on May 30, 1978, without prejudice. Mortgage foreclosure proceedings were thereafter commenced by the mortgagee of The Village Center's property because Penn Eastern failed to meet its mortgage obligations. The plaintiffs filed an emergency motion for the appointment of a receiver on June 23, 1978, but the motion was denied by the district court on June 26, 1978.
 
 
 8
 From approximately May 1977 onward, the trial judge assigned to the case made repeated efforts to have the parties reach a settlement. The trial was set to commence on August 21, 1978, but was postponed and a final settlement conference occurred. After it became apparent that a settlement could not be achieved, the trial judge reset the trial date for September 6, 1978. Meanwhile, the multi-million dollar shopping center owned by The Village Center, Ltd. was scheduled for a foreclosure sale on August 23, 1978. The foreclosure took place as scheduled. The plaintiffs had indicated during the summer that should the shopping center be lost, they would seek amendment of their complaint to include its loss as both grounds for liability and damages.
 
 
 9
 The parties returned to court for trial on September 6, 1978. Although represented by local counsel, the plaintiffs' active trial counsel had offices in Chicago, Illinois. The court did not commence trial, however, and instructed the parties to be available on twenty-four hours' notice. On September 18, 1978, the Johnsons tendered their proposed amendment to the complaint relating to the loss of the shopping center. This amendment was allowed but only on the issue of damages (the trial was bifurcated as to liability and damages). On September 19, 1978, trial began, but because of numerous interruptions the district court declared a mistrial once more and reset the case for trial. Trial was now fixed for February 20, 1979. The plaintiffs retendered their proposed amendment to the complaint as to liability shortly after the mistrial, but it remained without disposition for the next three months.
 
 
 10
 In the interval between the September 1978 mistrial and the new trial date, the plaintiffs, concerned over the trial judge's impartiality and his conduct of the trial, informally sought to have the Chief Judge of the Eastern District of Pennsylvania reassign the case. These efforts were unsuccessful. On February 7, 1979, the trial judge again rejected the proposed amendment to the complaint on the ground that it might delay the trial. Plaintiffs thereafter filed a motion on February 15, 1979, to have the trial judge recuse himself pursuant to 28 U.S.C. § 144 (1976), which was denied.
 
 
 11
 Trial thereafter commenced and lasted seventy-two days. During the course of the trial, plaintiffs petitioned this court for a writ of mandamus pursuant to 28 U.S.C. § 1651 (1976) to compel the judge's recusal. Our court denied the petition on June 27, 1979. Trial concluded on July 3, 1979, with a verdict in favor of the defendants. The plaintiffs filed a notice of appeal. After the notice was filed, the district court, without holding a hearing or providing notice, revoked the pro hac vice status of the plaintiffs' Chicago counsel effective as of the date of the jury's verdict. The plaintiffs and their Chicago counsel filed another notice of appeal to challenge this action. That appeal is dealt with in our separate opinion filed today.
 
 II.
 
 12
 We turn first to the district court's denial of the plaintiffs' motion to recuse. Even a brief examination of the factual and procedural history of this case reveals the tension existing between the parties and especially between the plaintiffs and the trial judge. Unfortunately, this tension was exacerbated both by the numerous delays in bringing the case to trial, the necessity for counsel to stand by for days in expectation of being called for trial, and the length of the trial.
 
 
 13
 The plaintiffs filed a motion pursuant to 28 U.S.C. § 144, which requires the district judge to recuse himself if personal bias or prejudice against or in favor of any adverse party exists. The district judge also raised, sua sponte, whether he should recuse himself pursuant to 28 U.S.C. § 455(a), which requires recusal if the judge's "impartiality might be reasonably questioned." Although Congress has not indicated the precise parameters of the two provisions, we need not decide that here because both statutes require the same type of bias for recusal and it is not present in this case.
 
 
 14
 In this circuit, review by this court of a district court's action on recusal is by an abuse of discretion standard. See Mayberry v. Maroney, 558 F.2d 1159, 1162-63 (3d Cir. 1977). In general, it seems that § 455(a) was intended only to change the standard the district judge is to apply to his or her conduct; it does not alter the type of bias required for recusal. Thus the rule under § 144 continues that only extrajudicial bias requires disqualification. See id. at 1162 n. 16. See generally H.Rep.No. 93-1453, reprinted in (1974) U.S.Code Cong. & Admin.News, pp. 6351, 6354-55.
 
 
 15
 "Extrajudicial bias" refers to a bias that is not derived from the evidence or conduct of the parties that the judge observes in the course of the proceedings. See United States v. Grinnell Corp., 384 U.S. 563, 580-83, 86 S.Ct. 1698, 1708-1710, 16 L.Ed.2d 778 (1966). Normally the judge's rulings at trial do not constitute grounds for recusal because they can be corrected by reversal on appeal. See Smith v. Danyo, 585 F.2d 83, 87 (3d Cir. 1978); United States v. Gallagher, 576 F.2d 1028, 1039 (3d Cir. 1978), cert. denied, 444 U.S. 1040, 100 S.Ct. 713, 62 L.Ed.2d 675 (1979).
 
 
 16
 We have examined the affidavits and other evidence pointed to by the plaintiffs and find no extrajudicial bias in this sense. The plaintiffs first point to certain scheduling and other rulings by the district court. As noted, however, these are not a basis for recusal.
 
 
 17
 Second, the plaintiffs argue that statements made by the district court during the settlement negotiations show extrajudicial bias. For example, the judge made statements at the final settlement conference to the effect that the lawsuit had been a "personal tragedy for the defendants" who were "honest men of high character." He also questioned the plaintiffs' motives in bringing the lawsuit and stated that plaintiff Gilbert Johnson was unable to reason logically from A to B. The plaintiffs' claim that these comments manifest extrajudicial bias is partially predicated on the timing of these statements namely, at a pretrial settlement conference before any evidence had been adduced which could serve as a basis for the formulation of an opinion on the trial judge's part.
 
 
 18
 In his opinion denying the motion to recuse, the judge explained that the challenged comments did not constitute extrajudicial bias. He stated that his remarks at the settlement conference were based on his perception of the case and were an attempt to have the parties reach an agreeable settlement. Although admitting that many of the statements "may have been intemperate," he concluded that such statements were not sufficient to warrant recusal.
 
 
 19
 We do not believe that the challenged statements necessarily were rendered extrajudicial merely because they were made at pretrial settlement conference. See Fong v. American Airlines, Inc., 431 F.Supp. 1334, 1338-39 (N.D.Cal.1977). Such a rule would unduly hamper the judge's ability to effectuate settlement. Moreover, the judge often can get a feel for a case prior to trial, which means that his perceptions can be based on the conduct of the parties and the evidence. Thus feelings about a case are not necessarily "extrajudicial" solely because they are made during settlement negotiations.
 
 
 20
 The relevant inquiry is whether the trial judge's pretrial comments were linked to his evaluation of the case based on the pleadings and other materials outlining the nature of the case, or whether the comments were based on purely personal feelings towards the parties and the case. It is undeniable that statements such as the case has been a "personal tragedy" for the defendants who are "honest men" of "high character" may superficially connote an extrajudicial source of information or, as we are inclined to believe, it may have been a form of judicial coloration in an overzealous effort to settle what obviously would be a lengthy and complicated case to try. We agree with the judge's candid concession that many of his statements may have been "intemperate." Indeed, this experience points out the restraints and objectivity a judge must maintain in an effort to achieve a settlement and the need to refrain from comments which might lead one party to conclude that a personal bias may exist against him.
 
 
 21
 We have carefully reviewed the plaintiffs' recusal affidavit and although the allegations are indeed troublesome, we believe on balance that they add up more to settlement fever than personal bias warranting recusal under either § 144 or § 455(a). Thus we cannot say that the district court abused its discretion in this case. Nevertheless, we take this opportunity to caution the district judges of this circuit that they must not permit their role as a negotiator to obscure their paramount duty to administer the law in a manner that is both fair in fact and has the appearance of fairness. Although settlement is important given the rising caseload, it can lead to action that is not consistent with the judicial function.
 
 III.
 
 22
 Next, the plaintiffs argue that the district court improperly charged the jury on their burden in overcoming the business judgment rule. That rule, which admittedly is part of the law of Delaware, provides that directors of a corporation are presumed to exercise their business judgment in the best interest of the corporation. The charge was as follows:
 
 
 23
 (T)he desire to retain control of a corporation in and of itself is an improper motive for decision of a director. Therefore, if you find by a preponderance of the evidence that the defendants acted solely or primarily because of a desire to retain control of Penn Eastern, then the presumption of the sound business judgment rule has been rebutted. However, I further instruct you that a director may properly decline to adopt a course of action which would result in a shift of control, so long as his actions can be attributed to a rational business purpose. In other words, so long as other rational business reasons support a director's decision, the mere fact that a business decision involves a retention of control does not constitute a showing of bad faith to rebut the business judgment rule. That rule is rebutted only where a director's sole or primary purpose for adopting a course of action or refusing to adopt another is to retain control. (emphasis supplied).
 
 
 24
 Instead of the emphasized language, the plaintiffs argue that they only needed to prove that control was "a" motive in the defendants' various actions to rebut the business judgment rule. We disagree for two reasons.
 
 
 25
 First, the purpose of the business judgment rule belies the plaintiffs' contention. It is frequently said that directors are fiduciaries. Although this statement is true in some senses, it is also obvious that if directors were held to the same standard as ordinary fiduciaries the corporation could not conduct business. For example, an ordinary fiduciary may not have the slightest conflict of interest in any transaction he undertakes on behalf of the trust. Yet by the very nature of corporate life a director has a certain amount of self-interest in everything he does. The very fact that the director wants to enhance corporate profits is in part attributable to his desire to keep shareholders satisfied so that they will not oust him.
 
 
 26
 The business judgment rule seeks to alleviate this problem by validating certain situations that otherwise would involve a conflict of interest for the ordinary fiduciary. The rule achieves this purpose by postulating that if actions are arguably taken for the benefit of the corporation, then the directors are presumed to have been exercising their sound business judgment rather than responding to any personal motivations.
 
 
 27
 Faced with the presumption raised by the rule, the question is what sort of showing the plaintiff must make to survive a motion for directed verdict. Because the rule presumes that business judgment was exercised, the plaintiff must make a showing from which a factfinder might infer that impermissible motives predominated in the making of the decision in question.
 
 
 28
 The plaintiffs' theory that "a" motive to control is sufficient to rebut the rule is inconsistent with this purpose. Because the rule is designed to validate certain transactions despite conflicts of interest, the plaintiffs' rule would negate that purpose, at least in many cases. As already noted, control is always arguably "a" motive in any action taken by a director. Hence plaintiffs could always make this showing and thereby undercut the purpose of the rule.
 
 
 29
 Second, the plaintiffs' argument is inconsistent with Delaware case law. Although scholars have argued about how much is required under Delaware law to rebut the business judgment rule, we need not resolve that debate. See E. Folk, The Delaware General Corporation Law 75-81 (1972); Arsht, Fiduciary Responsibilities of Directors, Officers and Key Employees,[4] 4 Del.J.Corp.L. 652, 660 (1979). At a minimum, the Delaware cases require that the plaintiff must show some sort of bad faith on the part of the defendant. See Arsht, supra. We do not think that a showing of "a" motive to retain control, without more, constitutes bad faith in this context unless we are to ignore the realities of corporate life. Accordingly, unless the plaintiff can tender evidence from which a factfinder might conclude that the defendant's sole or primary motive was to retain control, the presumption of the rule remains.
 
 
 30
 The primary source of the "sole or primary motive" test used in the charge here is Cheff v. Mathes, 41 Del.Ch. 494, 199 A.2d 548 (1964). Although the case explicitly contains this language, see 199 A.2d at 554, the plaintiffs would dismiss Cheff as a momentary aberration in the law of Delaware. An examination of the relevant cases, however, reveals that the test was used both before and after Cheff by the Delaware courts.
 
 
 31
 For example, Bennett v. Propp, 41 Del.Ch. 14, 187 A.2d 405 (1962), relied on by Cheff, expressly characterized the defendant's actions as a "thinly veiled attempt" to retain control. 187 A.2d at 409. Indeed, a reading of the opinion as a whole reveals that the court felt that there was no reason other than control for the actions in question. We do not see how Bennett's failure to use the talismanic phrase "sole or primary motive" in any way renders it inconsistent with Cheff.
 
 
 32
 Cases after Cheff have shown no inclination to abandon the sole or primary motive test. In Condec Corp. v. Lunkenheimer Co., 43 Del.Ch. 353, 230 A.2d 769 (1967), one of the cases relied on for this proposition, the vice chancellor made this express finding: "I have reached the conclusion that the primary purpose of the (actions in question) was to prevent control of Lunkenheimer from passing to Condec and to cause such control to pass into the hands of U.S. Industries." 230 A.2d at 775 (emphasis supplied). Other more recent cases have similarly spoken of "primary" motive in this regard. E. g., Petty v. Pentech Papers, Inc., 347 A.2d 140, 143 (Del.Ch.1975). Cf. Singer v. Magnavox Co., 380 A.2d 969, 980 (Del.1977) (stating that use of merger "solely" to eliminate minority violates majority's fiduciary duty).
 
 
 33
 In short, we believe that under Delaware law, at a minimum the plaintiff must make a showing that the sole or primary motive of the defendant was to retain control. If he makes a showing sufficient to survive a directed verdict, the burden then shifts to the defendant to show that the transaction in question had a valid corporate business purpose. Because the charge fairly contains such a standard, we find no error.
 
 IV.
 A.
 
 34
 The plaintiffs also raise as error the district court's refusal to permit them to amend their complaint on two occasions. The first of these concerned the loss through foreclosure in August 1978 of the shopping center that was Penn Eastern's major asset by virtue of its general partnership interest in The Village Center, Ltd. The motion to amend was originally submitted on September 18, 1978, one day before trial was to commence. The trial judge denied the motion to amend as to liability because it might unduly delay the liability phase of the trial, but permitted the amendment as to damages. When a mistrial of the liability portion of the trial was declared, and the case reset for a February 20, 1979 trial, plaintiffs retendered their amendment as to liability for the loss of the shopping center. No action was taken until February 7, 1979, when the retendered amendment was again rejected by the court because of "the severe prejudice that would result to the defendants if the amendment were allowed, as compared with the lack of prejudice to the plaintiffs caused by disallowance, since they may of course proceed to file the claims in a separate cause of action" and because of the "possibility that an amendment would delay the trial." The plaintiffs contend that the trial judge erred in rejecting their proposed amendment.
 
 
 35
 We need not decide whether the factors cited by the district court were sufficient to deny the amendment because in any event the foreclosure would not have been admissible under Delaware substantive law in the liability phase of the trial. Thus any error in denying the amendment was harmless under Fed.R.Civ.P. 61.[5]
 
 
 36
 The governing rule of Delaware law in this regard is: "(D)irectors satisfy their burden by showing good faith and reasonable investigation; the directors will not be penalized for an honest mistake of judgment, if the judgment appeared reasonable at the time the decision was made." Cheff v. Mathes, 41 Del.Ch. 494, 199 A.2d 548, 555 (1964) (emphasis supplied). The purpose of this rule is to protect corporate management from being judged by hindsight if a deal in fact goes sour. The sole question is management's state of mind at the time of the transaction. No matter how other facets of the business judgment rule operate, we have found nothing to indicate that this principle does not remain good law in Delaware.
 
 
 37
 Although in some cases events subsequent to a transaction might shed light on management's motives at the time of the transaction, such is not the case here. The plaintiff's have pointed to nothing that would indicate that the mere fact that the shopping center was foreclosed in 1978 shows anything about the defendants' pre-1975 motives, and we can conceive of no reason why it would. Because Delaware will not look at subsequent events unless they shed light on motive at the time of the transaction, any error was harmless.
 
 B.
 
 38
 The plaintiffs also attempted to amend the pleadings on the forty-third day of the trial to allege negligence on the part of the defendants in their performance of their duties as directors of Penn Eastern. This motion was made pursuant to Fed.R.Civ.P. 15(b), which permits the court to amend the pleadings to conform to the evidence of the trial. The district court denied the motion on the grounds of prejudice to the defendants because the allegation of negligence would shift the theory of the trial and force the defendants to prepare a mid-trial defense on a new issue.
 
 
 39
 Even assuming that negligence of directors states a cause of action under Delaware law, we cannot say it was an abuse of discretion under rule 15(b) to deny the motion. It is true that mere delay, in and of itself, is not grounds for denial of a motion to amend under rule 15(b). Nevertheless, when the delay combines with other extrinsic factors that result in actual prejudice to the party opposing the motion, denial is appropriate. Cf. Deakyne v. Commissioners of Lewes, 416 F.2d 290, 299-301 & n.19 (3d Cir. 1969) (amendment should have been permitted because no prejudice other than delay).
 
 
 40
 Here, as our recitation of the facts shows, the trial of the case had been protracted. Yet the plaintiffs have not explained why they failed to assert their negligence theory sooner. Indeed, the amendment was based primarily on a deposition that the plaintiffs sought to introduce in their own case in chief that had been taken quite some time prior to trial. Moreover, the plaintiffs were asserting a new theory that arguably would have prejudiced the defendants due to the fact that the events upon which the claims were made were rather stale by the time of the proposed amendment. Accordingly, we cannot say that the district court abused its discretion.
 
 V.
 
 41
 We have examined the remainder of the plaintiffs' contentions and find no reversible error. The judgment will be affirmed.
 
 
 42
 ROSENN, Circuit Judge, concurring and dissenting.
 
 
 43
 I join and concur in parts I and II of the majority opinion. I believe, however, that the district court committed reversible error and I therefore dissent from the remainder of the opinion, parts III through V.
 
 I.
 
 44
 This case presents several troublesome issues for our consideration but at the forefront are two questions concerning the district court's management of the trial. Even a cursory glance at the factual and procedural history of this case reveals the tension existing between the parties and especially between the plaintiffs and the trial judge. Unfortunately, this tension was exacerbated both by the numerous delays in bringing the case to trial, the necessity for counsel to stand by for days in expectation of being called for trial, and the length of the trial. Plaintiffs raise numerous arguments on appeal dealing with legal and evidentiary rulings made at trial, but first argue that the district court erred in denying two pre-trial motions: (1) the motion to amend the pleadings pursuant to Fed.R.Civ.P. 15; and (2) the motion to recuse under 28 U.S.C. § 144. As I have already noted, I concur in the majority's disposition of the motion to recuse and I will not again allude to this thorny issue. However, I believe the district court's disposition of the motion to amend the pleadings constituted reversible error.
 
 
 45
 Before I discuss the motion to amend, it may provide some perspective to recount the tortuous history of advancing the case to trial, especially because the denial of the motion to amend as to liability was on the ground that it might delay the trial. This case, initially set for trial on May 4, 1977, was called and a jury selected. The trial judge granted a mistrial because defendants' counsel, though previously on notice by a motion of the plaintiffs of the possible impropriety of such conduct, injected prejudicial and improper remarks in their opening arguments to the jury. Although the plaintiffs moved for and all parties urged the prompt calling of a new jury, the district court did not rule on the request but sometime later set November 30, 1977, as the trial date. The court subsequently vacated this date and several others that were thereafter set and ultimately set August 21, 1978. The parties appeared on that date but the trial judge declined to begin the trial and renewed his extensive efforts to have the parties reach a settlement.
 
 
 46
 After it became apparent that a settlement could not be achieved, the trial judge reset the trial date for September 6, 1978. Meanwhile, the multi-million dollar shopping center owned by The Village Center, Ltd., was scheduled for a foreclosure sale on August 23, 1978. The foreclosure took place as advertised. The Johnsons had given notice on August 21 that should the shopping center be lost, they would seek amendment of their complaint to include its loss as both grounds for liability and damages. The court had advised plaintiffs' counsel that they would be permitted to amend their pleadings orally during trial.
 
 
 47
 The parties returned to court for trial on September 6, 1978. The court did not commence trial on the day fixed and instructed the parties and counsel to be available on twenty-four hours' notice, although principal counsel representing the Johnsons maintained his law offices in Chicago, Illinois, and was not permitted to return meanwhile. On September 18, 1978, the Johnsons tendered their proposed amendment to the complaint relating to the loss of the shopping center. This amendment was allowed only on the issue of damages but denied as to liability on the ground that such an allowance might delay the liability phase of the trial. On September 19, 1978, trial finally got underway, but because of numerous interruptions, many at the instance of the court, the trial judge aborted the trial once again. Trial was now fixed for February 20, 1979. The Johnsons once more tendered their proposed amendment to the complaint as to liability but the trial judge held it without disposition for the next three months. On February 7, 1979, the trial judge again rejected the proposed amendment to the complaint on the ground that it might delay the trial.
 
 A. The Post-1975 Claims
 
 48
 Plaintiffs made two motions to amend the pleadings to add additional claims against the defendants. The first of these concerned the loss through foreclosure in August 1978 of the shopping center which was Penn Eastern's major asset by virtue of its general partnership interest in The Village Center, Ltd. As already adverted to, the written motion to amend was originally submitted on September 18, 1978, one day before trial was to commence. The trial judge denied the motion to amend as to liability because it might unduly delay the liability phase of the trial, but permitted the amendment as to damages. When a mistrial of the liability portion of the trial was declared on September 29, 1978, and the case reset for a February 20, 1979 trial, plaintiffs promptly retendered their amendment as to liability for the loss of the shopping center. The court took no action until February 7, 1979, when the retendered amendment was again rejected by the court because of "the severe prejudice that would result to the defendants if the amendment were allowed, as compared with the lack of prejudice to the plaintiffs caused by disallowance, since they may of course proceed to file the claims in a separate cause of action" and because of the "possibility that an amendment would delay the trial. . . ." The Johnsons contend that the trial judge erred in rejecting their proposed amendment. I agree.
 
 
 49
 The governing rule on amendment of the pleadings is Fed.R.Civ.P. 15(a)[1] which provides in relevant part:
 
 
 50
 A party may amend his pleading once as a matter of course at any time before a responsive pleading is served . . . . Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be granted when justice so requires. . . .
 
 
 51
 The Johnsons had already amended their complaint as a matter of course to include claims against Harry Salwen as a Penn Eastern director. The grant of their motion to amend the pleadings to include the loss of the shopping center therefore rested within the discretion of the court. Indeed, the Johnsons admit that they must show an abuse of discretion on the part of the district court. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); Cornell & Co. v. OSHRC, 573 F.2d 820, 823 (3d Cir. 1978); 3 Moore's Federal Practice P 15.08(4) (2d ed. 1979).
 
 
 52
 Rule 15(a) itself provides that amendments should be "freely given when justice so requires." The courts have taken a liberal approach to permitting amendments under Rule 15(a). In Foman v. Davis, supra, 371 U.S. at 182, 83 S.Ct. at 230, the Court held:
 
 
 53
 If the underlying facts or circumstances relied upon by the plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claims on the merits. In the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. the leave sought should, as the rules require, be "freely given."
 
 
 54
 Accord, Cornell & Co., supra; Goodman v. Mead & Johnson Co., 534 F.2d 566 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).
 
 
 55
 Two grounds were asserted by the district court for the denial of plaintiffs' motion to amend: (1) severe prejudice to the defendants, and (2) the possibility of trial delay. I find neither of these possibilities sufficiently significant to warrant denial of the motion to amend.
 
 
 56
 I consider first the possibility of prejudice to the defendants because "(i)t is well-settled that prejudice to the non-moving party is the touchstone for the denial of an amendment." Cornell & Co., supra, 573 F.2d at 823. The exact nature and degree of prejudice necessary for denial of an amendment is not readily susceptible to a precise formula, but I believe that the defendants must show that the amendment would adversely affect their ability to defend adequately the case. Cf. Deakyne v. Commissioners of Lewes, 416 F.2d 290, 300 (3d Cir. 1969) (prejudice under Rule 15(b) means difficulty in prosecuting a lawsuit as a result of tactical or theoretical change by other party). Otherwise, both the interests of judicial economy and justice might be frustrated by denial of the amendment and resultant second trial. Professor Moore writes that
 
 
 57
 (r)ecognizing that the entire spirit of the (federal) rules is to the effect that controversies shall be decided on the merits, the courts have not been hesitant to allow amendments for the purpose of presenting the real issues of the case, where . . . the opposing party will not be unduly prejudiced. . . .
 
 
 58
 3 Moore's, supra, P 15.08(2), at 15-61-62 (footnotes omitted).
 
 
 59
 The defendants marshal little evidence that the proposed amendment by the plaintiffs would have prejudiced them. The proximity of the original proposed amendment to the trial date in September 1978 conceivably could have made it difficult for the defendants to prepare adequately to counter a claim of corporate mismanagement in the loss of the shopping center. However, as plaintiffs point out, the only witnesses relevant to the issue of the extent of the shopping center's loss were under the defendant's control.
 
 
 60
 We need not be concerned with the issue of whether acceptance of the proposed amendment in September 1978 would have prejudiced defendants in the preparation of their case, for assuming such prejudice existed, it disappeared after the declaration of the September mistrial and subsequent retendering of the amendment more than three months prior to the rescheduled trial date in February 1979. Had the district court acted promptly and granted the motion to amend, the defendants certainly would have had ample time to prepare a defense to any claim arising out of the shopping center's loss. If there were prejudice to the defendants, which we fail to perceive, it was due solely to the failure of the court to act on plaintiffs' timely filed motion to amend. Indeed, since the foreclosure occurred in August 1978, it is difficult to see how plaintiffs could have tendered their proposed amendment much earlier. I hardly think it befits the spirit of Rule 15(a) for the court to attribute prejudice from a proposed amendment of the pleadings to the plaintiffs, when the root of the inconvenience to the defendants, if any, is the court's inaction. I perceive no prejudice to the defendants chargeable to the plaintiffs which warrants rejection of their proposed amendment to the pleadings.[2]
 
 
 61
 The district court both in its September 1978 and February 1979 denial of plaintiffs' motion to amend, cited adverse delay in the liability phase of the trial as a basis for rejection of the amendment. But this court has specifically indicated that "(d)elay alone, however, is an insufficient ground to deny an amendment, unless the delay unduly prejudices the non-moving party." Cornell & Co., supra, 573 F.2d at 823. See also Deakyne, supra, 416 F.2d at 300 n.19. Although possible interruption of the trial in September to permit discovery on the proposed new claim might have been a sufficient threat of prejudicial delay to warrant rejection of the amendment when first offered, the mistrial and three-month delay in retrial obviated any prejudice to defendants when the amendment was retendered. The delay that followed in the disposition of that amendment was not due in the slightest to the plaintiffs' lack of diligence or good faith. I therefore believe that the district court erred in denying plaintiffs' retendered motion to amend under Rule 15(a) to include the post-1975 claim arising out of the foreclosure of the shopping center.
 
 
 62
 The defendants argue, however, that even if the district court erred in rejecting the amendment, plaintiffs are entitled to a new trial only on the post-1975 claims arising out of the foreclosure because this event was severable from the other claims of fraud and breach of fiduciary duty.[3] Defendants argue that the presentation of evidence on the post-1975 claims would have had no impact on the jury's consideration of the pre-1975 claims in the complaint. I find this argument untenable.
 
 
 63
 The pre-1975 claims all involved charges of either fraud, mismanagement or breach of fiduciary duty on the part of the defendants in their handling of Penn Eastern's financial affairs. Central to plaintiffs' charges was their belief that at the time the defendants acted, they were not motivated by the best interests of Penn Eastern. The basis of the plaintiffs' complaint was that the loans and sale of stock and other assets by the defendants to meet the financial difficulties of The Village Center, Ltd., were motivated not by the corporation's best interests but rather by the defendants' personal motives to maintain corporate control. Conversely, the defendants' major defense was one of "unclean hands" in that plaintiffs' motives were similarly the control of Penn Eastern. I believe the loss of Penn Eastern's major asset, the shopping center, certainly was germane in confirming plaintiffs' theory that the defendants were not acting in the best interests of Penn Eastern in managing its financial affairs and were breaching their fiduciary duties to the corporation and its shareholders. The jury, without knowledge of the loss of the shopping center, may have been more willing to accept the defendants' version of their exercise of discretion in the management of Penn Eastern's affairs. With knowledge of the loss of the shopping center and of plaintiffs' admonition to the defendants of the need to act to forestall the impending foreclosures, the jury might well have found plaintiffs' complaint meritorious. With the complaint amended and the shopping center sold at sheriff's sale, the jury could well have concluded that the decisions made by the defendants were not in Penn Eastern's best interests, and were not honest mistakes of judgment, but were dictated solely by personal motives of corporate control.
 
 
 64
 In sum, the issues would have been drawn more sharply, the basis of plaintiffs' charges concretized, and the jury might have rendered its verdict for the plaintiffs. Simply put, without the inclusion of the loss of the shopping center, the jury would not have had the full picture of Penn Eastern's corporate disintegration for the attempts to restore financial health to Penn Eastern by the Pierce loan and sale of stock to Arnold Trueblood might have been viewed by the jury as apparently little more than cosmetic stop-gaps. I therefore cannot agree with the majority that the failure to allow the amendment amounted only to harmless error. I believe that the district court's erroneous denial of the amendment to include post-1975 claims taints the entire trial and that a new trial on all issues is necessary.[4]
 
 B. The Negligence Claims
 
 65
 The plaintiffs also attempted to amend the pleadings on the forty-third day of the trial to allege negligence on the part of the defendants in their performance of their duties as directors of Penn Eastern. This motion was made pursuant to Fed.R.Civ.P. 15(b) which permits the court to amend the pleadings to conform to the evidence of the trial.[5] The district court denied the motion on the grounds of prejudice to the defendants because the allegations of negligence would shift the theory of the trial and force the defendants to prepare a mid-trial defense on a new issue.
 
 
 66
 I will not deal with the correctness of the court's ruling on this motion because my conclusion that a new trial is required moots the issue whether the court properly denied the negligence amendment. Given the necessity of preparing for a retrial of this case under my analysis, I perceive little prejudice to the defendants in additionally preparing a defense to a negligence claim, and, unless other prejudice is evident, the court should be liberal in granting the motion to amend.
 
 II.
 
 67
 A major issue in this case is whether the defendants acted in good faith in managing Penn Eastern's affairs or whether they acted for an improper purpose namely, the desire to retain control over Penn Eastern when it was not in its best interest. If the defendants acted in good faith, the business judgment rule would insulate them from any losses as a result of their decisions.
 
 The court instructed the jury as follows:
 
 68
 (T)he desire to retain control of a corporation in and of itself is an improper motive for decision of a director. Therefore, if you find by a preponderance of the evidence that the defendants acted solely or primarily because of a desire to retain control of Penn Eastern, then the presumption of the sound business judgment rule has been rebutted. However, I further instruct you that a director may properly decline to adopt a course of action which would result in a shift of control, so long as his actions can be attributed to a rational business purpose. In other words, so long as other rational business reasons support a director's decision, the mere fact that a business decision involves the retention of control does not constitute a showing of bad faith to rebut the business judgment rule. That rule is rebutted only where a director's sole or primary purpose for adopting a course of action or refusing to adopt another is to retain control. (Emphasis added.)
 
 
 69
 The plaintiffs complain that the last sentence of the instruction incorrectly sets forth their burden of proof under Delaware law. They claim that to rebut the business judgment rule, they need not demonstrate that the defendants' "sole or primary" motive was the desire to retain control; only that control was a motive. I am persuaded that an examination of the relevant case law supports the plaintiffs' view that the district court's instruction was erroneous. I do not agree with the majority that plaintiffs' theory is inconsistent with Delaware case law.
 
 
 70
 I start with the case of Bennett v. Propp, 41 Del.Ch. 14, 187 A.2d 405 (1962), in which the plaintiffs-shareholders challenged the purchase of a large quantity of the corporation's stock on behalf of the corporation by its principal executive, allegedly to dissipate a take-over bid and to retain control over the corporation. The Supreme Court of Delaware invalidated the purchase, noting "the inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy." 187 A.2d at 409. Because the court recognized the corporate dangers when directors are confronted with a conflict of interest and the subtleties involved in their decisions under such circumstances, it imposed the burden on the directors of vindicating the transaction, stating: "The directors are of necessity confronted with a conflict of interest, and an objective decision is difficult. . . . Hence, in our opinion, the burden should be on the directors to justify such a purchase as one primarily in the corporate interest." Id. (emphasis added).
 
 
 71
 I read Bennett as holding that when a transaction involving control of a corporation raises a conflict of interest on the part of the board of directors, the burden is then thrust upon the defendants to go forward with proof establishing the fairness of the transaction. In other words, the business judgment presumption is dissipated once the plaintiffs show that an improper purpose control was a motive. This result is fully consistent with the purpose of the business judgment rule which is to insulate routine matters of corporate expertise from judicial scrutiny:
 
 
 72
 The theoretical justification for the business judgment rule is that courts should be reluctant to review the acts of directors in situations where the directors' expertise is likely to be greater than the court's; thus the rule may be viewed as a guide for judicial restraint. A strong implication follows that the courts should not apply the rule where the decisions of directors are influenced by forces tending to create conflicts of interest. In such contexts, there is a great danger that the directors will channel their expertise toward pursuit of personal advantage.
 
 
 73
 R. Gelfond & S. Sebastian, Reevaluating the Duties of Target Management in a Hostile Tender Offer, 60 B.U.L.Rev. 403, 435 (1980) (footnotes omitted).
 
 
 74
 Placing the burden of justifying the fairness of the transaction on the defendants, once control is implicated as a motive, appears to be confirmed in the case of Cheff v. Mathes, supra, which cites with approval the dispositive holding of Bennett concerning the burden of going forward with proof. See 199 A.2d at 554. The court in Cheff, however, citing Bennett, appears to have introduced an element of ambiguity when it stated: "(I)f the board has acted solely or primarily because of the desire to perpetuate themselves in office, the use of corporate funds for such purposes is improper." It is the court's mention of "sole" or "primary" purpose in Cheff which produced the problem in the instant case. This statement made in the court's discussion of liability, not the burden of proof, nonetheless cites Bennett v. Propp, supra. The district court and the majority read this language as placing an initial burden of proof on the plaintiffs to overcome the business judgment presumption. However, when it reached the question of the burden of proof to show the presence or lack of good faith on the part of the board of directors, the Cheff court fully and unequivocally reiterated the burden of proof rule it announced in Bennett, again stating that the burden is on the directors to justify the transaction "as one primarily in the corporate interest." Cheff v. Mathes, supra, 199 A.2d at 554. Nothing in Bennett or Cheff suggests that the plaintiff must first prove that the sole or primary purpose of the transaction was the directors' desire to retain control over the corporation.[6] Rather, the unequivocal thrust of Bennett is that once the record demonstrates that control is implicated in the transaction, a conflict of interest is ipso facto created. Once a conflict of interest is present, the burden of proof is shifted logically and pragmatically on the defendants "to justify (the transaction) as one primarily in the corporate interest." Bennett, supra, 187 A.2d at 409. Indeed, the "primary purpose" language of Cheff appears to be directed towards the defendant's burden in justifying the transaction, i. e., that the sole or primary purpose was not control.
 
 
 75
 The sole or primary purpose language of Cheff was not utilized in Condec Corp. v. Lunkenheimer Co., 43 Del.Ch. 353, 230 A.2d 769, 776 (1967), where the court stated:
 
 
 76
 Where, however, the objective sought in the issuance of stock is not merely the pursual of a business purpose but also to retain control, it has been held to be a mockery to suggest that the "control" effect of an agreement in litigation is merely incidental to its primary business objective.
 
 
 77
 This language supports Bennett's rule that the issue of control as a motive is so central to the issue of business judgment that the burden is on the defendant to justify the soundness of the transaction as one primarily in the corporate interest.[7] Recent Delaware cases reveal a growing trend to impose stricter obligations on management to justify control-related transactions. Cf. Singer v. Magnavox, Co., 380 A.2d 969 (Del.1977) (freeze-out merger by majority shareholders subject to fairness test); Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del.1971) (intrinsic fairness test and not business judgment rule applies where parent corporation receives benefit to the exclusion and detriment of subsidiary); Petty v. Penntech Papers, Inc., 347 A.2d 140, 143 (Del.Ch.1975) (a purchase of shares with corporate funds to remove a threat to management policy and control casts the burden on defendant directors to justify the purchase as "one primarily in the corporate interest and not their own").
 
 
 78
 Therefore, I believe that a standard requiring plaintiffs to show that control was the sole or primary purpose motivating the defendants' conduct imposes a burden on the plaintiffs not consistent with Delaware law. Unlike the majority, I believe that under Delaware law, once plaintiff has shown that the desire to retain control was a motive in the particular business decision under challenge, the burden is then on the defendant to move forward with evidence justifying the transaction as primarily in the corporation's best interest. Accordingly, I believe the district court erred in its charge to the jury and that the case should be remanded for new trial.
 
 
 
 [1]
 The Johnsons each paid $25,000 for their 25 shares in Penn Eastern. Samuel and Arnold Trueblood and Siana received 25 shares of Penn Eastern in exchange for their one-third interest in the Red Caboose property. Siana's 25 shares were repurchased by the corporation on August 21, 1978. Later purchases of stock by the Johnsons and Harry Salwen resulted in the 47 percent-53 percent split in ownership of Penn Eastern
 
 
 [2]
 The Board of Directors was composed of the Truebloods, Salwen, the Johnsons, and Rolland Henderson, a nonshareholder director. The Truebloods, Salwen and Henderson voted in favor of the Pierce loan; the Johnsons against it
 
 
 [3]
 The complaint may be broken down into four basic charges:
 
 
 [1]
 The Truebloods knowingly misrepresented to Gilbert Johnson the value of the Red Caboose property when it was sold to Penn Eastern in 1968 in exchange for Penn Eastern stock
 
 
 [2]
 The rejection of the Johnsons' proposed loan and acceptance of the Pierce loan was motivated by the defendants' determination to retain control over Penn Eastern regardless of the corporation's best interests and was accordingly a breach of fiduciary duty
 
 
 [3]
 The rejection of the Johnsons' loan in favor of selling the Red Caboose property at absolute auction to meet the payments of the Pierce loan was in the disinterest of Penn Eastern and motivated by the defendants' desire to retain control over it
 
 
 [4]
 The rejection of Gilbert Johnson's offer to purchase twenty shares of Penn Eastern stock and acceptance of the Truebloods' loan proposal constituted breaches of fiduciary duty by the defendants
 The issues raised on appeal concern only the state law claims.
 
 
 [4]
 We are advised that the correct title is:
 The Business Judgment Rule in Delaware and Its Applicability To The Fiduciary Responsibilities of Directors, Officers and Controlling Stockholders.
 
 
 [5]
 At least one commentator has noted that courts are split on whether the merits of an amendment are proper matters to be considered by a district court under rule 15(a). See 3 Moore's Federal Practice P 15.08(4), at 15-105. We are not presented with that question, however, because the district court did not address this question. On appeal, however, we are required to address the merits because we may only reverse for errors that satisfy rule 61
 
 
 [1]
 Plaintiffs argue in this court that Fed.R.Civ.P. 15(b) applies. That rule allows a court to amend the pleadings to conform to the evidence. Inasmuch as the instant amendment was made before trial, the applicable rule is Fed.R.Civ.P. 15(a) which governs amendments to the pleadings in general
 
 
 [2]
 The district court opined and the defendants contend that the plaintiffs could have brought their claims arising out of the loss of the shopping center in a separate action. In the absence of specific demonstrable prejudice to the defendants, alternatives open to the plaintiffs are simply not relevant. In any event, both the possibility of collateral estoppel effect on the second trial, the interests of judicial economy and additional expenses of litigation weighed in favor of accepting the proposed amendment
 
 
 [3]
 This assumes that no reversible error was committed with respect to the pre-1975 claims, an issue which I consider in part, II, infra
 
 
 [4]
 Although the trial of this case was unnecessarily prolonged, a new trial can be expedited and condensed
 
 
 [5]
 Fed.R.Civ.P. 15(b) provides in relevant part: When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise those issues may be made upon motion of any party at any time, even after judgment;
 
 
 [6]
 Indeed, I believe such a test would be exceedingly difficult to apply. For example, if the plaintiff could show that control dominated the corporate decision by 50% or more, would the business judgment presumption disappear; but if he shows only 49% control motive, the presumption remains? Further, we believe it would be difficult to determine exactly what subjective motive was involved since any decision may involve a multitude of considerations. Also, under the majority's reading of Cheff, it is unclear whose motive or purpose is involved: is it the entire board of directors, one director, or a majority of the board?
 
 
 [7]
 Although the court in Condec found that control was the primary purpose of the transaction, see 230 A.2d at 775, nothing in the opinion suggests that plaintiffs must first prove control to be the sole or primary purpose before the business judgment presumption disappears. Indeed, the court in Condec refrained from placing the full burden on the defendants to justify the transaction because it was not established that the directors were acting in their own self-interest. See id. at 776-77