UNITED STATES of America

v.

Michael SCIARRA and Joseph Sheridan, Petitioners,

Honorable Harold A. Ackerman, Nominal Respondent.

UNITED STATES of America

v.

LOCAL 560 OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, Salvatore Provenzano, President; Joseph Sheridan, Vice President; Josephine Provenzano Septembre, Secretary–Treasurer; J. W. Dildine, Recording Secretary; Thomas Reynolds, Sr., Trustee; Michael Sciarra, Trustee; Stanley Jaronko, Trustee; Trucking Employees of North Jersey Welfare Fund, Inc.; Salvatore Provenzano, Employee Trustee; Thomas Reynolds, Sr., Employee Trustee; Local 560 Officers and Employees Severance Pay Plan; Salvatore Provenzano, Trustee and Administrator; Josephine B. Septembre, Trustee and Administrator; Anthony Provenzano, Individually; Nunzio Provenzano, Individually; Stephen Andretta, Individually; Thomas Andretta, Individually; Gabriel Briguglio, Individually.

Appeal of Michael SCIARRA and Joseph Sheridan, Appellants.

Nos. 88–5119, 88–5120.

United States Court of Appeals, Third Circuit.

Argued April 15, 1988.

Decided June 27, 1988.

Rehearing and Rehearing In Banc Denied July 25, 1988.

Harvey Weissbard (argued), Weissbard & Wiewiorka, Alan L. Zegas (argued), West Orange, N.J., for petitioners.

Samuel A. Alito, Jr., U.S. Atty., Jerome L. Merin (argued), Asst. U.S. Atty., Robert C. Stewart, Sp. Atty. in Charge, U.S. Dept. of Justice, Newark, N.J., for respondent.

Sidney Reitman, Bennet D. Zurofsky (argued), Reitman, Parsonnet, Maisel & Duggan, Newark, N.J., for Local 560, et al.

Before HUTCHINSON, SCIRICA, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This complex appeal presents several novel questions arising out of a federal district court's continuing efforts to purge Local 560 of the International Brotherhood of Teamsters of a twenty-five year history of corruption and indignity. On December 17, 1987, the United States sought an order from Judge Harold A. Ackerman of the United States District Court for the District of New Jersey compelling the petitioners, Michael Sciarra and Joseph Sheridan, to give testimony by oral examination.

The petitioners thereafter filed a cross-motion demanding Judge Ackerman's recusal pursuant to 28 U.S.C. § 455. By order dated February 8, 1988, the district court granted the Government's application, and denied petitioners' cross-motion. Sheridan and Sciarra now appeal. We affirm the district court's order compelling the petitioners to submit to oral depositions. We additionally vacate the district court's denial of petitioners' cross-motion and dismiss their appeal without prejudice.

## I.

We begin our disposition of the present appeal with an excursion into the history of its controversial antecedents. On March 9, 1982, the Government filed a civil complaint against Local 560 and twelve individual defendants alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 et seq.[1] *See United States v. Local 560, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, et al.*, 581 F.Supp. 279 (D.N.J. 1984). Among the named individual defendants were the petitioners who, at the time of suit, were members of Local 560's executive board. After a fifty-one day bench trial, the district court held that members of the Provenzano crime family, aided and abetted by Local 560's executive board, acquired an interest in and control of the union through a pattern of racketeering activity in contravention of 18 U.S.C. § 1962(b), (c) and (d).

Relying upon the expansive provisions of 18 U.S.C. § 1964, the district court proceeded to fashion an equitable remedy unprecedented in scope and in imagination. *See id.* at 337–38. Recognizing the likelihood of future RICO violations, the court enjoined Provenzano group defendants Stephen Andretta and Gabriel Briguglio from any subsequent affiliation with Local 560.[2] It additionally directed the removal of the Local's entire executive board in favor of a trusteeship designed to "foster the conditions under which reasonably free supervised elections can be held...."[3] *Id.* at 337. Upon the completion of free elections, the trusteeship was to be dissolved.[4] *Id.* To further effectuate its remedy, the court retained jurisdiction over Local 560 as a nominal defendant. *Id.* The Local's Welfare Fund and Severance Pay Plan were, however, explicitly dismissed from the action. Finally, the court stayed the implementation of its injunctive relief pending appeal.

On December 12, 1985, we affirmed the district court's opinion in its entirety, *United States v. Local 560*, 780 F.2d 267 (3d Cir.1985), and subsequently denied petitioners' applications for panel rehearing and for rehearing in banc.[5] Thus, on June 23, 1986, some two years after the issuance of its final judgment, the district court vacated the stay and appointed Joel R. Jacobson trustee. As a result, Sciarra relinquished his position as executive board president, an appointment he had held since October 29, 1984. Sheridan correspondingly resigned the board's vice-presidency.

In the succeeding months, the trustee acted in conformity with the district court's 1984 judgment: Peter DeCarlo was permanently enjoined from entering Local 560's premises, and Teamster Joint Council 73 was compelled to recognize the trusteeship as the functional equivalent of the Local's

---

1. The complaint additionally named Local 560's Welfare and Pension Funds and its Severance Pay Plan as defendants.

2. Unlike Andretta and Briguglio, Local 560's former executive board members were not permanently enjoined from future participation in the union.

3. The district court observed that the removal of the executive board was mandated by each member's refusal to objectively evaluate the criminal conduct of fellow officers or business agents, or to institute prophylactic measures to preclude repetition of past criminal conduct. 581 F.Supp. at 321. In particular, the court noted that both Sciarra and Sheridan refused to acknowledge the guilt of convicted Provenzano group members, or to institute any safeguards against future criminal activity.

4. Prior to *Local 560*, no court had imposed a trusteeship upon a labor union to remedy the continuing effects of a RICO Act violation.

5. The Supreme Court denied certiorari on May 27, 1986. 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986).

former executive board. On May 12, 1987, however, the court replaced Jacobson with Edwin Steir.[6]

On December 17, 1987, the Government, relying upon 18 U.S.C. § 1964, 28 U.S.C. § 1651, and upon the 1984 judgment, applied to Judge Ackerman for an order directing Sciarra, Sheridan, and former defendant Stanley Jaronko to show cause why they should not be compelled to submit to oral depositions at the Newark, New Jersey offices of the United States Attorney. Specifically, the Government sought information regarding Local 560's operations during the two year stay period, including Sciarra's role in the de-unionization of New England Motor Freight Company, his post-1984 communications with Stephen Andretta and Matthew Ianniello concerning the continued influence of the Provenzano group on Local 560, his employment of the DiBiasi law firm[7] to manage Local 560's Prepaid Legal Services Plan, and his failure to institute safeguards against corrupt union practices during his two year term as president of the executive board. The Government additionally intended to depose Sheridan regarding his participation in Sciarra's appointment as president, and his failure, as vice-president of the executive board, to institute safeguards against abuses by employers and by employee representatives. The Government concluded its application by acknowledging that the petitioners' testimony might indeed form the predicate "for additional relief ... necessary in order to prevent future racketeering violations involving the continued domination ... and exploitation ... of Local 560."

In response to the Government's discovery request, the petitioners filed a cross-motion seeking Judge Ackerman's disqualification pursuant to 28 U.S.C. § 455(a) and (b)(1). Sheridan and Sciarra predicated their motion, in part, upon an affidavit submitted by Joel Jacobson which averred[8] that during the winter of 1986–1987, Judge Ackerman directed the former trustee to terminate two members of Local 560's Pension and Welfare Funds. When Jacobson expressed reluctance, the judge allegedly replied: "Joel, when it comes to members of Local 560, they're guilty until proven innocent." Jacobson added that Judge Ackerman repeated the phrase at a second meeting several days later. Jacobson's affidavit concluded by asserting that his discharge was based upon his "refusal to support [Judge Ackerman's] abandonment of the presumption of innocence for the officers and members of Local 560."[9]

Petitioners additionally relied upon statements made by Judge Ackerman to several newspapers. In the October 8, 1987, edition of the "Bergen Record," Jacobson asserted that Judge Ackerman had directed him "to go get something on [Sciarra]." Moreover, an article appearing in the "Wall Street Journal" on February 10, 1987, quoted the judge as stating that:

> Elements of the old regime are plotting to regain power. They're there, I know it.... It's like squeezing water out of a wash rag.... There's still a lot of dirty water in that rag....

Finally, Sheridan and Sciarra based their motion upon a recent nationally televised CBS "60 Minutes" broadcast in which Judge Ackerman made extensive comments regarding the Local 560 litigation. For example, the judge asserted that:

> Mikey Sciarra testified that he was praying for the return of Tony Pro Provenzano. Can you imagine? Here's a man who's president of a local union who knows that another individual, Anthony

---

**6.** Frank Jackiewicz was additionally appointed as Assistant Trustee.

**7.** The Government contends that the DiBiasi firm had engaged in numerous improprieties during its prior management of the fund from 1978 to 1980.

**8.** Jacobson's affidavit was not available to the district court prior to the issuance of its Febru-

ary 8 order. On petitioners' motion, the affidavit was added to the record on appeal.

**9.** An affidavit submitted by Sidney Reitman, general counsel to Local 560, denies that Judge Ackerman made the statements ascribed to him by Jacobson. Our disposition of petitioners' recusal motion renders it unnecessary for us to resolve the conflicting factual contentions contained in the respective affidavits.

Provenzano, killed a fellow member of the union—had him strangled—was convicted of that charge—stands convicted today of an extortion—yet he's praying that Provenzano should return? What does it say for his character? ... You had a police state in effect here in which democracy in this local union was just—uh—non-existent. They'd like to have an election which is similar to that conducted in the Soviet Union today—one candidate, that's it.

In addition to alleging grounds for recusal based upon the appearance of partiality,[10] the petitioners contended that Judge Ackerman had "personal knowledge of disputed evidentiary facts" in violation of § 455(b)(1), and was related to a potential material witness in violation of § 455(b)(5)(iv). Specifically, Sheridan and Sciarra contended that the judge had extrajudicial knowledge of Local 560's Prepaid Legal Services Plan, and that he was related to Gerald Glassman, a former attorney of New England Motor Freight, whose testimony might be necessary to future litigation.

On January 28, 1988, Judge Ackerman heard oral argument on the respective motions. The judge initially considered the appropriate substantive standard for recusal under section 455(a). Relying upon our decision in *United States v. Dalfonso*, 707 F.2d 757, 760 (3d Cir.1983), he noted that disqualification is mandated "when a reasonable man knowing all the circumstances would harbor doubts concerning the judge's impartiality." The judge added

that evidence of impartiality must relate to extrajudicial events or sources of information, "what a judge learns through proceedings in the case from which recusal is sought does not give rise to bias...." *See Johnson v. Trueblood*, 629 F.2d 287, 290–291 (3d Cir.1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). Judge Ackerman next observed that section 455(a) specifies no procedural guidelines for deciding a recusal motion. Therefore, he turned to 28 U.S.C. § 144,[11] and in conformity with it, accepted the truth of the allegations contained in the relevant affidavits.[12]

Considering the merits of the petitioners' cross-motion, the judge decided that the contents of the February 10, 1987, "Wall Street Journal" article failed to demonstrate the requisite extrajudicial bias. He concluded that his statements asserting "that the 'old regime' still plotted to regain power, or that more 'squeezing' was required," constituted nothing more than restatements of his earlier trial findings recognizing the need to insulate Local 560 against the continuing influence of the Provenzano group. He similarly asserted that his alleged remark instructing Jacobson "to get something on [Sciarra]" also failed to support a finding of extrajudicial bias. Judge Ackerman relied upon his prior adjudication of Sciarra's RICO liability to justify his directive to the trustee "to focus part of his energies on Mr. Sciarra in working to ensure that the Provenzano Group was out and staying out."[13]

---

**10.** The substance of both Jacobson's allegations and the relevant newspaper articles was repeated in affidavits submitted by Sheridan and by Sciarra.

**11.** 28 U.S.C. § 144 entitled "Bias or Prejudice of Judge," states:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists....

**12.** There is considerable authority for the proposition that the factual accuracy of affidavits submitted pursuant to 28 U.S.C. § 455 may be scrutinized by the court deciding the motion for recusal. *See, e.g., United States v. State of Alabama*, 828 F.2d 1532, 1541 (11th Cir.1987); *Hamm v. Members of Bd. of Regents of Florida*, 708 F.2d 647, 651 (11th Cir.1983); *In re International Business Machines Corp.*, 618 F.2d 923, 927–29 (2d Cir.1980); *see also* 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, §§ 3542 and 3550 (1984).

**13.** In the alternative, the judge implied that because his alleged statement constituted double hearsay, the affidavit in which it was contained was not legally sufficient.

The judge next evaluated the prejudicial implications of his alleged statement concerning the application of a presumption of guilt to Local 560's members. Judge Ackerman found that an examination of the context in which the comment was made precluded any inference of bias. Specifically, he noted that although the alleged comment appeared to concern a discussion between Jacobson and the court about criminal trials, "the case at hand is a civil case, in which civil liability, not guilt, is ultimately at stake." The judge concluded that the comment would therefore make "no sense to a reasonable, informed person...."[14] Finally, the judge rejected the petitioners' allegations that he had extrajudicial knowledge of a disputed fact, and that he was related to a potential material witness within the meaning of § 455(b)(5)(iv).

Having denied petitioners' cross-motion, the district court next considered whether it had authority to compel Sheridan and Sciarra to submit to oral depositions notwithstanding their compliance with the 1984 judgment.[15] Initially, the court held that the Government had standing to apply for discovery without the trustee's approval. Relying upon the petitioners' continuing status as defendants to the 1984 action, and the broad authority granted by the RICO statute to effectuate appropriate relief, the court concluded that Sheridan and Sciarra could indeed be required to give testimony. An order memorializing the court's respective dispositions was executed on February 8, 1988.

On February 9, 1988, the petitioners sought a stay of the court's order pending appeal. Observing that the importance of effectuating the objectives contained in the 1984 judgment outweighed any harm that petitioners might suffer by giving testimony, the court denied the application. Sheri-

dan and Sciarra filed a notice of appeal on February 10, 1988. On February 16, the petitioners again applied for a stay and for a writ of mandamus, this time to the court of appeals.[16] On February 18, we denied petitioners' application and referred all subsequent motions to a merits panel.

On February 19, the petitioners, citing Judge Ackerman's bias against them, refused to comply with the district court's discovery order. After a hearing, Judge Ackerman held both Sheridan and Sciarra in contempt, but deferred the issue of sanctions for three days. On February 22, Sheridan agreed to testify, but upon Sciarra's continued refusal to obey the order, Judge Ackerman imposed a civil sanction of $500 per day which he stayed for twenty-four hours. On February 23, Sciarra also agreed to testify and the judge vacated the contempt order. This appeal followed.

## II.

### A.

The Government raises an initial challenge to our appellate jurisdiction, arguing that the February 8 order is not appealable within the meaning of 28 U.S.C. § 1291 or any of its statutory exceptions.[17] The Government additionally contends that the petitioners are not entitled to a writ of mandamus based upon their failure to establish an irreparable injury, or a clear error of law. We first consider the appealability of that portion of the order compelling petitioners to give testimony.

Contrary to the Government, Sheridan and Sciarra contend that section 1291 confers jurisdiction upon us to review the discovery order. Noting that the order was entered long *after* the district court ren-

---

**14.** Because a transcript of the "60 Minutes" television broadcast was not before the court prior to the issuance of its order, Judge Ackerman had no opportunity to pass upon the prejudicial impact of its contents.

**15.** It is undisputed that the petitioners relinquished their positions on Local 560's executive board in compliance with the 1984 judgment.

**16.** An accompanying appendix contained, for the first time, copies of the Jacobson affidavit and an edited transcript of the "60 Minutes" broadcast.

**17.** The Government contends that jurisdiction may not be predicated upon either § 1292(a)(1) or the collateral order doctrine. *See Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

dered a final judgment in the 1984 action, the petitioners argue that declaring it final will not result in interference with continuing trial court proceedings, nor create the possibility of repetitious appellate consideration of related issues. *See* 15 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 3916 at 607; *United States v. State of Washington*, 761 F.2d 1404 (9th Cir.1985) (post-judgment order modifying fishing rights between Indian tribes and State of Washington held appealable under section 1291). Secondly, petitioners note that if the depositions fail to culminate in an actual suit, we will never again have occasion to review the order.

In the alternative, Sheridan and Sciarra assert that the discovery order is appealable under the collateral order doctrine, or as an interlocutory injunction pursuant to section 1292(a)(1). In the event that none of the preceding statutory predicates confers jurisdiction, petitioners request us to issue a writ of mandamus. Because we hold that the discovery order is appealable pursuant to section 1291, we need not address any of the petitioners' remaining jurisdictional arguments.

Section 1291 of 28 U.S.C. provides, in pertinent part, that "the court of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States." The Supreme Court has observed that a final judgment or order is one that conclusively determines the rights of parties to the litigation, leaving "nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). Perhaps recognizing the futility of attempting to distill the elusive and irreducible requisites of section 1291 into a single phrase, the Court has also observed that "finality is to be given a practical rather than a technical construction." *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964). It may therefore prove more illuminating to examine the finality rule with reference to its underlying policies and purposes.

In *Firestone Tire and Rubber Co. v. Risjord*, 449 U.S. 368, 374, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981), the Court asserted that the finality rule "emphasizes the deference that appellate courts owe to the trial judge as the individual initially called upon to decide the many questions of law and fact that occur in the course of a trial." Therefore, its well established hostility to piecemeal review derives, in part, from its desire to facilitate the independence of the trial judge, "as well as the special role that individual plays in our judicial system." *Id.* Moreover, the Court added, the rule is in accordance with the policy of avoiding " 'the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment.' " *Id.* (quoting *Cobbledick v. United States*, 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940)). *See also DiBella v. United States*, 369 U.S. 121, 124, 82 S.Ct. 654, 656, 7 L.Ed.2d 614 (1962). Finally, the rule also serves the important policy of promoting judicial administration. *Firestone*, 449 U.S. at 374, 101 S.Ct. at 673; *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 170, 94 S.Ct. 2140, 2149, 40 L.Ed.2d 732 (1974). In *Borden v. Sylk*, we succinctly summarized the preceding principles by suggesting that "the most important considerations in deciding the issue of finality are 'the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other.' " 410 F.2d 843, 845 (3d Cir.1969) (quoting *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950)).

It is well established that discovery orders are generally not final, and hence not immediately appealable under section 1291, because the litigation in conjunction with which the discovery is sought is still pending in the district court. *Gross v. G.D. Searle & Co.*, 738 F.2d 600, 602 (3d Cir. 1984); *DeMasi v. Weiss*, 669 F.2d 114, 121 (3d Cir.1982). We have noted that discovery orders typically bespeak their own

interlocutory character; they are necessarily only a stage in the litigation and almost invariably involve no determination of the substantive rights involved in the action. *DeMasi,* 669 F.2d at 122 (quoting *Borden,* 410 F.2d at 845).

We have also consistently held that a non-party witness to an action may obtain immediate review of a discovery order upon disobedience and contempt. *DeMasi,* 669 F.2d at 122. For example, in *Gross,* this court rejected an attempt by Eyelab Inc., a non-party witness, to obtain appellate review of its refusal to comply with a subpoena *duces tecum* absent the issuance of a contempt order. 738 F.2d at 603–04. Relying upon *Alexander v. United States,* 201 U.S. 117, 121, 26 S.Ct. 356, 358, 50 L.Ed. 686 (1906), we noted that:

> [T]he Supreme Court [has] held that until the witness is adjudicated in contempt such an order lacks finality: "Let the court go further and punish the witness for contempt of its order, then arrives a right of review...." ... The non-party witnesses therefore have a remedy by appeal, but that right must await their willingness to stand in contempt of the district court's order. [citations omitted].

Requiring a non-party witness to stand in contempt as a precondition for appellate review accords with section 1291's policy of avoiding piecemeal litigation. The contempt order effectively transforms the "interlocutory" into the "final" by giving the witness a distinct and severable interest in the underlying action. *See Cobbledick,* 309 U.S. at 328, 60 S.Ct. at 543. Although the disobedient witness inevitably disrupts the orderly progress of the litigation, courts are willing to tolerate his interference when, upon issuance of a contempt order, the witness has obtained a "stake" in the underlying action sufficient to warrant judicial intervention.[18] *See id.* at 328, 60 S.Ct. at 542. Finally, we note that because *a party* may appeal from a final judgment, he may not obtain appellate review of a

discovery order notwithstanding the entry of a civil contempt order against him. *See DeMasi,* 669 F.2d at 122; *Cromaglass Corp. v. Ferm,* 500 F.2d 601, 604 (3d Cir. 1974) (in banc).

Are there, however, situations in which a non-party witness may obtain appellate review of a discovery order without being held in contempt? We believe the answer lies in recognizing that section 1291's proscriptions against piecemeal review and against obstruction of just claims are not implicated absent the disruption of an ongoing case or controversy. We note that the phrase "interlocutory" necessarily implies some underlying proceeding from which the challenged discovery is an "offshoot." The many cases that characterize discovery orders as interlocutory become inapposite, therefore, when there simply is no underlying suit to disrupt. The rationale for requiring a witness to incur a contempt order as a jurisdictional predicate similarly breaks down when there is no central proceeding from which he must be severed. *See Cobbledick,* 309 U.S. at 328, 60 S.Ct. at 542; *and see IBM v. United States,* 493 F.2d 112, 115 n.1 (2d Cir.1973) ("where the contempt proceeding is the sole court proceeding involved, as is the case where administrative agencies attempt to enforce orders, the civil contempt is not interlocutory in any sense"); *Newton v. National Broadcasting Co., Inc.,* 726 F.2d 591, 593 (9th Cir.1984) (discussing exceptions to requirement that non-party in discovery dispute must first suffer contempt). Thus, Professors Wright and Miller observe that the general rule precluding appellate review of discovery orders is inapplicable "if the only proceeding pending is the application for discovery...." 8 C. Wright and A. Miller, *supra,* § 2006 at 29. *See also* 9 J. Moore, *Moore's Federal Practice,* ¶ 110.13[2] at 155–157 (2d ed. 1987).

We find additional support for our position in *Sheehan v. Doyle,* 513 F.2d 895 (1st Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct.

---

**18.** The *Alexander* Court expressed the basis for requiring contempt by observing:

> This power to punish being exercised the matter becomes *personal to the witness and a judgment as to him.* Prior to that the proceedings are interlocutory in the original suit. (Emphasis added).

201 U.S. at 122, 26 S.Ct. at 358.

144, 46 L.Ed.2d 106 (1975), a case construing the authority of a district court to order discovery in aid of a patent interference proceeding. Invoking Fed.R.Civ.P. 34, the court ordered defendant to disclose various unprivileged documents. On appeal, the First Circuit considered whether the discovery order was reviewable pursuant to section 1291. *Id.* at 898. It observed that the order was the *only* facet of the interference proceeding pending before the district court;[19] upon entry of the order, the business of the court was, at least temporarily, concluded. *Id.* Notwithstanding the general policy against appellate review of discovery orders, the court of appeals held that the finality rule had been satisfied:

> The instant order, therefore, concluded—at least for the moment—the business of the district court. Thus, while the usual policy against piecemeal appellate review dictates otherwise, we must regard the order as final and appealable. *See Natta v. Hogan*, 392 F.2d 686, 689 (10th Cir. 1968). (Indeed, Doyle has sought more discovery since this appeal was heard, and the district court's next ruling would likewise be final and appealable).

*Id.*

Similarly, in *Cobbledick*, 309 U.S. at 323, 60 S.Ct. at 540, the Supreme Court considered whether an appeal was available from a district court's denial of motions to quash subpoenas *duces tecum* directing several witnesses to appear and produce documents before a grand jury. In denying jurisdiction, the Court asserted that like a conventional criminal trial, a grand jury proceeding is entitled to protection against undue interruption and delay. *Id.* at 327, 60 S.Ct. at 542. Thus, to safeguard the "orderly progress" of what it characterized as a "judicial inquiry," the Court mandated that the disobedient witnesses be held in contempt as a precondition for appellate review. *Id.* at 329–30, 60 S.Ct. at 543. However, in reliance upon *Interstate Commerce Commission v. Brimson*, 154 U.S.

447, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894), and upon *Harriman v. Interstate Commerce Comm'n*, 211 U.S. 407, 29 S.Ct. 115, 53 L.Ed. 253 (1908), the Court contemplated situations where, based upon the absence of an underlying case or controversy, a witness might be able to obtain review absent contempt:

> But a proceeding like that under § 12 of the Interstate Commerce Act may be deemed self-contained, so far as the judiciary is concerned—as much so as an independent suit in equity in which appeal will lie from an injunction without the necessity of waiting for disobedience. After the court has ordered a recusant witness to testify before the Commission, there remains nothing for it to do. Not only is this true with respect to the particular witness whose testimony is sought; there is not, as in the case of a grand jury or trial, any further judicial inquiry which would be halted were the offending witness permitted to appeal. The proceeding before the district court is not ancillary to any judicial proceeding. So far as the court is concerned, it is complete in itself.

*Id.* 309 U.S. at 330, 60 S.Ct. at 543.

In light of the preceding discussion, we conclude that a non-party witness[20] may obtain appellate review of a discovery order absent contempt only if there is no real possibility of disrupting an underlying action. *See Alexander*, 201 U.S. at 121, 26 S.Ct. at 357. Applying our conclusions to the case before us, however, presents another problem to which we now turn.

### B.

Before deciding the issue of appealability, we must determine whether the petitioners are *parties* to an actual suit or merely *non-party witnesses* to the Government's exercise of its investigative authority. As we have already noted, a determination that the petitioners are parties

---

19. The actual interference proceeding was pending before the Patent Office, and not before a federal court. Patent Office procedures did not provide for discovery.

20. Presumably, our mandate could not apply to *a party* because he could not fail to disrupt the very proceeding which he has initiated or is defending.

would effectively preclude their jurisdictional argument under section 1291. A review of the district court's 1984 final judgment provides an appropriate place to begin our inquiry.

In addition to creating the trusteeship, the 1984 judgment permanently enjoined defendants Andretta and Briguglio from future participation in Local 560, and mandated the removal of the union's entire executive board, including the petitioners. The judgment imposed no additional substantive remedy against Sheridan and Sciarra. Following our affirmance, the stay of the district court's judgment was vacated and the petitioners appropriately relinquished their executive positions. The Government does not attempt to argue, nor could it, that Sheridan and Sciarra are in contempt of the 1984 judgment. We additionally observe that neither the trustee nor the Government has instituted any subsequent action against the petitioners designed to alter or affect their substantive rights, such as a suit enjoining them from participating in Local 560's upcoming elections.

█ We construe the Government's oral deposition demand as a mere request for information that may, or may not, ultimately lead to an action against the petitioners.[21] The closing paragraph of the Government's order to show cause application candidly concedes:

> In order to formulate the precise nature of that relief and to structure a future course of action with respect to the restoration of democratic processes within Local 560, the Government *needs additional information* about the matters identified herein, as well as about a number of similar matters which have come to the Government's attention during the period of the Trusteeship. (emphasis added).

Based upon the foregoing, we conclude that the petitioners are, at this point,[22] only non-party witnesses to an investigation, rather than parties to an actual case or controversy designed to adjudicate their substantive rights.

In support of its discovery order, the district court held that petitioners were presently before it as defendants to the ongoing 1984 action.[23] We reject that conclusion. The district court explicitly retained jurisdiction only over Local 560 as a nominal defendant, and released the union's retirement and pension funds. 581 F.Supp. at 337. No mention of either the petitioners' release or retention is contained in the final judgment. There is no basis to imply the petitioners' continuing status as defendants from the district court's silence, especially in light of their compliance with the 1984 judgment.

We finally come to the essence of our jurisdictional inquiry; whether section 1291 confers appellate jurisdiction upon us to review the district court's discovery order. We must determine whether our assertion of jurisdiction in the context of an ongoing trusteeship will violate the purposes and policies underlying section 1291 by disrupting what amounts to an ongoing actual case or controversy. In this regard, we note that petitioners' characterization of the instant appeal as a naked "post-judgment order" is simply inaccurate; the exist-

---

**21.** Because no objection has been interposed by the current trustee to the Government's institution of discovery, and because petitioners have purged themselves of contempt by complying with the district court's order, we need not reach the issue of whether the Government, as the party who sought the trusteeship, could initiate discovery proceedings over the objection of the trustee.

**22.** Petitioners strenuously argue that the district court's discovery order is a precursor to the Government's institution of an injunctive action against them. Although we sympathize with the petitioners' apprehension, we are simply unable to determine the ultimate effect that the deposi-

tions might have on the Government's subsequent conduct. In the event that an injunctive proceeding is initiated against them, the petitioners, of course, will be invested with the full panoply of rights available to parties.

**23.** The court asserted:

> Second, I reject the argument Mr. Sciarra and Mr. Sheridan are now beyond my jurisdiction in this case. They were two of the original defendants. Only the Local 560 retirement plans and pension funds have been dismissed as defendants since this case began.... Thus, Mr. Sciarra and Mr. Sheridan remain defendants.

ence of the trusteeship thrusts this case into the darkest recesses of the finality rule.

We again observe that the court fashioned the trusteeship as a means of implementing the objectives contained in the 1984 judgment, namely, to facilitate free elections by purging Local 560 of the persistent remnants of racketeering. To that end, the court empowered the trustee to seek modification of the 1984 judgment, or any other necessary relief. We therefore cannot deny that the trusteeship retained some vitality as an ongoing proceeding, although not of sufficient character to require protection from disruption and delay under section 1291. At the time the court ordered discovery there was no pending judicial action in which the rights of these, or any other individuals, were being adjudicated. Indeed, the court's *only* act was to order the petitioners to provide depositions. Once it implemented the order, the district court, at least for the moment, completed its business. *See Sheehan*, 513 F.2d at 898, and *Cobbledick*, 309 U.S. at 330, 60 S.Ct. at 543.

Concededly, the court ordered discovery in the context of an ongoing trusteeship. However, we cannot say that the trusteeship, standing alone, is analogous to the underlying actions in *DeMasi* and *Gross* in which substantive rights of parties to actual disputes were being adjudicated. Absent the trustee's initiation of a substantive adversarial proceeding, we cannot characterize the instant discovery order as interlocutory to *anything*. Similarly, we note that the trusteeship is distinguishable from the grand jury proceeding in *Cobbledick*. While the grand jury investigation constituted an ongoing judicial inquiry, 309 U.S. at 327, 60 S.Ct. at 542, the discovery order here amounts to nothing more than an isolated judicial act.

■ Based on the absence of an underlying judicial action, we hold that the discovery order is appealable pursuant to section 1291 notwithstanding petitioners' failure to incur a contempt order.[24] Under the unique circumstances present here, our holding is consistent with the policies of section 1291; there is no threat of piecemeal review or of obstruction to a just claim. To the Government's contention that our holding will disrupt the administration of the trusteeship, we respond: when and if the trustee institutes an action modifying the substantive rights of the petitioners or of another third party, any discovery orders issued in conjunction with that suit, including those issued to non-par-

---

**24.** We observe that our holding is inapplicable to discovery ordered in a grand jury proceeding, *see, e.g., Cobbledick*, 309 U.S. at 323, 60 S.Ct. at 540, in an aid of execution of judgment action, *see, e.g., United States v. Fried*, 386 F.2d 691 (2d Cir.1967), and in a civil action after the filing of a complaint. In *Fried,* the Government served an information subpoena against non-party witness Albert Fried in an attempt to satisfy an unpaid $175,000 judgment entered against Fried's father. 386 F.2d at 692–93. The appellate court dismissed the appeal from the denial of the witness' motion to quash the subpoena for lack of jurisdiction. Relying upon *Alexander,* the court concluded that Fried's failure to stand in contempt precluded appellate review. *Id.* at 694–95. We believe, however, that *Fried* is distinguishable from the facts before us. Unlike the defendant in *Fried,* Sheridan and Sciarra *have indeed satisfied* the underlying final judgment against them. In light of Fried's *non-compliance* with the judgment, the district court's discovery order was interlocutory and therefore unappealable. Under the circumstances present in *Fried,* permitting appellate review would have disrupted an active underlying controversy. On the other hand, the petitioners' relinquishment of their executive board positions closed the 1984 action as to them, and consequently rendered the discovery order at issue final.

An additional facet of *Fried*'s finality discussion warrants our attention. In depicting the basis for requiring a witness to submit to contempt, the court observed:

> With the number of appeals having increased almost 70% in the last five years … as against the much smaller growth in district court litigation, this is no time to weaken the historic rule putting a witness' sincerity to the test of having to risk a contempt citation as a condition to appeal, however harsh its application may seem to the appellant here.

Although determining the degree of a witness' "sincerity" may at times be relevant to the contempt requirement, we do not believe that such an inquiry is appropriate here. Unlike the present case, *Fried* concerned a witness' arguably dishonest attempt to avoid compliance with a discovery order by feigning illness. Absent comparable circumstances, there is no need to insist upon contempt to demonstrate petitioners' sincerity.

ty witnesses, will be held interlocutory for the purposes of section 1291.

### C.

We now consider the merits of the discovery order; that is, whether the district court had authority to compel non-party witnesses Sheridan and Sciarra to give testimony. Not surprisingly, petitioners challenge the court's exercise of authority and additionally argue that the Government had no standing to seek discovery, and that it did not articulate the scope of the depositions with sufficient clarity. We first consider the question of standing.

Entitled "Depositions Upon Oral Examination," Fed.R.Civ.P. 30(a) states in pertinent part: "After commencement of the action, *any party* may take the testimony of any person, including a party, by deposition upon oral examination." (emphasis added). We are immediately confronted by the question of whether, given the entry of a final judgment in the 1984 action, the Government is a "party" to an "action" within the meaning of the Rule. We once again are required to define the role of the trusteeship in this suit.

■ As we have already noted, the trusteeship is not, at present, engaged in any proceeding designed to affect the substantive rights of either the petitioners or any other third party. Although this apparent dormancy might compel us to conclude that there is no "action" pursuant to Rule 30(a), a review of the trusteeship's objectives leads to an opposite holding. In replacing Local 560's executive board, the court designed the trusteeship to oversee the·union's day-to-day operations and eradicate the residual impact of past racketeer domination. We therefore hold that the ongoing maintenance and protection of the trusteeship constitutes an action for the purposes of Rule 30(a). Moreover, the Government was a party to the 1984 action

which created the trusteeship. Therefore, we conclude that the Government remains a party, within the meaning of the Rule, to any subsequent investigative activities it takes to effectuate the objectives of the 1984 final judgment.[25] Accordingly, we hold that the Government had standing to seek petitioners' depositions.

■ We next reject petitioners' contention that the deposition request failed to state the scope of the proposed examinations with sufficient clarity. The Government's order to show cause explicitly sought information regarding Sciarra's role in the deunionization of New England Motor Freight Company, his communications with Andretta and Briguglio, his management of Local 560's prepaid Legal Services Plan, and his failure, while executive board president, to institute safeguards designed to eradicate the continued influence of the Provenzano group. Similarly, the Government sought testimony from Sheridan regarding his participation in Sciarra's appointment as president, and his failure, while executive board vice-president, to institute safeguards against abuses by employers or employee representatives.

■ Petitioners finally contend that the court had no power to compel them in their capacity as non-party witnesses to submit to oral depositions absent the institution of a criminal or civil proceeding. We disagree. Relying upon the broad authority conferred upon district courts to remedy violations of the RICO Act, this court in *Local 560* upheld Judge Ackerman's removal of the executive board and establishment of the trusteeship. 780 F.2d at 295. Over the petitioners' objection, the judge construed our affirmance as empowering him to order depositions in order to effectively protect and maintain the administration of the trusteeship. We recognize that he premised his order, in part, upon his

---

**25.** Taken in conjunction with our jurisdictional holding, our present conclusion posits the trusteeship as a jurisprudential hybrid imbued with the capacity to institute substantive and investigative proceedings. We do not believe that there is any inconsistency between our respective dispositions. Based upon its nexus to the

1984 judgment, the maintenance and protection of the trusteeship constitutes an "action" pursuant to Fed.R.Civ.P. 30(a). However, because the order to submit to depositions is independent of any actual proceeding to adjudicate substantive rights, we conclude that section 1291's proscriptions are not implicated.

belief that the petitioners were before the court as defendants to the 1984 action. Although we have rejected that conclusion for reasons heretofore stated, we nonetheless affirm the district court's discovery order.

Section 1964(a) of the RICO Act reinforces our conclusion. It enables courts to prevent violations of section 1962 by "issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise and imposing reasonable restrictions on the future activities or investments of any person." In its report accompanying the proposed RICO Act, the House of Representatives acknowledged section 1964(a)'s expansive scope:

> [Section 1964(a)] contains broad provisions to allow for reform of corrupted organizations. Although certain remedies are set out, the list is not meant to be exhaustive, and the only limit on remedies is that they accomplish the aim set out of removing the corrupting influence and make due provision for the rights of innocent persons.

H.R.Rep. No. 91–1549, 91st Cong.2nd Sess. 2, *reprinted in* 1970 U.S.Code Cong. & Ad.News 4007, 4034. *See also Local 560*, 780 F.2d at 295. Quoting *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985), we have similarly observed that:

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, *see United States v. Turkette*, 452 U.S. 576, 586–87, 101 S.Ct. 2524, 2530–31, 69 L.Ed.2d 246 (1981), but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes." Pub.L. 91–452, § 904(a), 84 Stat. 947.

*Local 560*, 780 F.2d at 295.

In initially establishing the trusteeship, the district court, as did we in affirming, recognized the continuing need during the life of the trusteeship for judicial supervision and control over the daily operations of Local 560. Accordingly, we now hold that the district court properly ordered the petitioners to submit to oral depositions to effectuate the administration of the trusteeship. We believe that any other conclusion would preclude the trusteeship from fulfilling its mandate.

### III.

#### A.

We now consider the final issue presented by this appeal—whether the district court erred in denying petitioners' motion to recuse, asserted pursuant to 28 U.S.C. § 455(a) and (b)(1). Our disposition of this issue requires us to examine the important question of justiciability.

Article III of the Constitution limits the "judicial power" of the United States to the resolution of actual "cases" and "controversies." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). The concept of standing is an incident to the elaboration of this basic constitutional requirement. *Id.* Unlike associated doctrines, standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37–38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Essentially, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The Supreme Court has consistently observed that the standing inquiry entails a blend of constitutional requirements and prudential considerations. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The dichotomy has often proven more troublesome than illuminating. *See Valley Forge*, 454 U.S. at 471, 102 S.Ct. at 757. In any event, the doctrine, in both its constitutional and prudential respects, "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth*, 422 U.S. at 498, 95 S.Ct.

at 2205. In its constitutional dimension, the doctrine requires ·a litigant invoking a federal court's authority to " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Gladstone,* 441 U.S. at 99, 99 S.Ct. at 1608 and *Simon,* 426 U.S. at 38, 41, 96 S.Ct. at 1924, 1925). In *Warth,* the Court recognized that the standing inquiry may, at times, be resolved with reference to the nature and source of the claim asserted by the litigant. 422 U.S. at 500, 95 S.Ct. at 2206. Specifically, it observed that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' " *Id.* (quoting *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947). *See also Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). Applying *Warth* to the present dispute, we seek to determine for the first time in any recorded decision whether section 455(a) confers standing upon non-party witnesses who have not been adjudged in contempt to challenge the impartiality of a federal judge.

### B.

In 1974, Congress enacted the present version[26] of the federal disqualification statute. Based largely on Canon 3C of the ABA Code of Judicial Conduct, § 455 states in relevant part:

§ 455 Disqualification of justice, judge, or magistrate.

(a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

\* \* \* \* \* \*

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

\* \* \* \* \* \*

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding. . . .

Congress designated subsection (a) of the statute as a "general or catch-all provision" designed to enhance public confidence in the impartiality of the judicial system by requiring a federal judge *to disqualify himself* in any proceeding when "his impartiality might reasonably be questioned."[27] *See* H.R.Rep. 1453, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Cong. Code & Admin. News 6351, 6354–55; and *see also State of Idaho v. Freeman,* 507 F.Supp. 706, 720–21 (D.Idaho 1981). Our court has interpreted subsection (a) to mean that "a judge should recuse himself where a reasonable man knowing all the circumstances would harbor doubts concerning the judge's impartiality." *United States v. Dalfonso,* 707 F.2d at 760. ·We have also held that only extrajudicial bias[28] requires

26. Prior to 1974, § 455 read as follows:
§ 455 Interest of justice or judge.
Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein.
Act of June 25, 1948, ch. 646, § 455, 62 Stat. 908.

27. In creating a self-imposing duty on judges to disqualify themselves under appropriate circumstances, section 455(a) explicitly sought to eradicate the "duty to sit" presumption. 1974 U.S.Cong. Code & Admin.News at 6355. Under the 1948 statute, a judge, faced with a close question on disqualification, was urged to resolve the conflict in favor of a duty to sit.

28. "Extrajudicial bias" refers to a bias that is not derived from the evidence or conduct of the

disqualification. *Johnson v. Trueblood*, 629 F.2d at 290–91.

In the legislative history accompanying section 455, Congress observed that subsection (b) of the statute established particular instances in which disqualification is required. 1974 U.S.Cong. Code & Admin. News at 6355. It noted that the "specific situations in subsection (b) are in addition to the general standard set forth in subsection (a)." *Id.* Appropriately, we have recognized a distinction between the two subsections. Although subsection (a) requires only the objective appearance of bias, subsection (b)(1) requires bias-in-fact. *United States v. Nobel*, 696 F.2d 231, 235 (3d Cir. 1982), *cert. denied*, 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983). *See also United States v. Heldt*, 668 F.2d 1238, 1271 (D.C.Cir.1981), *cert. denied sub nom. Hubbard v. United States*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). Other courts have rejected our dichotomy. *See Parrish v. Board of Comm'rs of Alabama State Bar*, 524 F.2d 98 (5th Cir.1975), *cert. denied sub nom. Davis v. Board of School Comm'rs*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976) (bias-in-fact standard governs all motions to disqualify under sections 144, 455(b)(1) and 455(a)).

We note that a second apparent distinction between the two subsections presents a question of even greater significance for our purposes: Subsection (b) mandates disqualification for personal bias concerning *a party*, but subsection (a) requires recusal *in any proceeding* in which the judge's impartiality might be questioned. (emphasis added). We must decide whether section 455(a)'s failure to explicitly limit its application to "parties" permits a motion by non-party witnesses, or stated in another way, whether the subsection's reference to a "proceeding" embraces the discovery order at issue.[29]

■ We note that section 455(d)(1) defines "proceeding" to include "pre-trial, trial, appellate review, or other stages of litigation." Each of the statutory examples of a proceeding implies the judge's participation in decisions affecting the substantive rights of litigants to an actual case or controversy. For example, the "pre-trial" stage, in most instances, begins with the filing of a complaint, an indictment, or some other adversarial document that identifies the parties and the substantive issues to be litigated. Almost all of a judge's pre-trial rulings and orders might affect the ultimate adjudication of substantive rights. Accordingly, section 455 confers a right upon the litigant to seek recusal at this stage. It follows that the statute grants a similar right during subsequent phases of the litigation, when a judge has already decided, or is in the process of deciding, the most significant issues presented in a case. We therefore construe section 455(a)'s "proceeding" requirement to embrace only such activity following the initiation of an action by a private party or governmental agency designed ultimately to modify or affect the substantive rights of a litigant.

Our conclusion is supported by section 455(a)'s legislative history which states in relevant part:

> [T]his general standard is designed to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside *over the case*. (Emphasis added).

1974 U.S.Cong. Code & Admin.News at 6355. We believe that Congress' reference to "a case" implies its intention to limit the application of section 455 to actual controversies. We also acknowledge those precedents asserting, albeit in dicta, that section 455 may be invoked by a party to an action. *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1051 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *United States v. Conforte*, 624 F.2d 869, 880 (9th Cir.),

---

parties that the judge observes in the course of the proceedings. *Johnson*, 629 F.2d at 291.

**29.** Notably, petitioners predicated their bias allegation on section 455(a), and their "personal knowledge of a disputed fact" charge on section 455(b)(1).

*cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).[30]

■ Accordingly, we hold that the petitioners have no standing to invoke section 455 in their capacity as non-party witnesses.[31] As we have already observed, there is no pending action before Judge Ackerman in which the rights of the petitioners are at issue. Moreover, the petitioners' depositions were not taken in conjunction with a substantive proceeding against a third party. Admittedly, the thread of judicial intervention in this dispute is thin; the district court's sole activity with respect to Sheridan and Sciarra was to compel them to submit to depositions at the offices of the United States Attorney. The court neither conducted the depositions nor attended them. Under these circumstances, we can safely say that section 455's directive to enhance public confidence in the judiciary is simply not implicated by declaring petitioners outside the scope of the statute.[32] Appropriately, we conclude that the petitioners have not sustained an "actual injury" within the meaning of Article III. They have done nothing more than their public duty, inconvenient as it may have been, to provide nonprivileged information requested by their government. We acknowledge that compelling a witness to disclose *privileged* information might indeed result in an irreparable injury "because appellate courts cannot always 'unring the bell' once the information has been released." *Maness v. Meyers,* 419 U.S. 449, 460–61, 95 S.Ct. 584, 592, 42 L.Ed.2d 574 (1975). Petitioners have not, however, raised such a claim. Finally, we express no opinion regarding the standing of a non-party witness to invoke the disqualification statute in the context of an actual case or controversy.

This is not to suggest, however, that we in any way seek to minimize the force of petitioners' allegations of bias. In the event that a proper party institutes an adversarial action before Judge Ackerman designed to modify or alter the substantive rights of Sheridan and Sciarra, the petitioners may reassert without prejudice a motion requesting the judge's recusal. Only then will petitioners have suffered an actual or threatened injury, and have achieved the status to invoke section 455. At that point, the court will be presented with an action in which petitioners' rights are at stake.

## IV.

In sum, the district court's order compelling the petitioners to submit to oral depositions will be affirmed. Petitioners' appeal from the denial of their cross-motion demanding recusal will be dismissed without prejudice and with additional directions to the district court to vacate its order on the cross-motion and dismiss it without prejudice for reasons consistent with this opinion. Each side to bear its own costs.

---

**30.** We note that *Davis* additionally concluded that attorneys may not invoke section 455 without demonstrating judicial bias directed at a party. 517 F.2d at 1050–1052.

**31.** Thus, we do not reach the petitioners' argument that Judge Ackerman's alleged violation of the Code of Judicial Conduct's proscription against public commentary on pending judicial matters constitutes a *per se* violation of section 455(a).

**32.** We recognize that section 455(a) was designed, in part, to "broaden and clarify the grounds for disqualification." 119 Cong.Rec. 33029 (1973); *United States v. Ritter,* 540 F.2d 459, 462 (10th Cir.1976), *cert. denied sub nom. Olson Farms, Inc. v. United States,* 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1980). We are also aware of precedents asserting that the expansive language of subsection (a) may have been intended to reach factual contexts not covered by subsection (b). *See, e.g., Conforte,* 624 F.2d at 880. Although we believe that section 455(a) may indeed have extended the scope of actionable judicial conduct, we conclude that it was not designed to expand the community of prospective litigants able to invoke it.